IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:17-cv-2872

BONNIE BIRSE, individually and as the representative of a class consisting of the participants and beneficiaries of the CenturyLink Dollars & Sense 401(k) Plan invested in the Active Large Cap U.S. Stock Fund,

       Plaintiff,

v.

CENTURYLINK, INC.; CENTURYLINK INVESTMENT MANAGEMENT COMPANY; CENTURYLINK EMPLOYEE BENEFITS COMMITTEE; MARINA PEARSON; AND DOES 1 THROUGH 10 CONSISTING OF THE MEMBERS OF THE CENTURYLINK EMPLOYEE BENEFITS COMMITTEE,

       Defendants.

_____

## COMPLAINT UNDER EMPLOYEE RETIREMENT INCOME SECURITY ACT
_____

Plaintiff Bonnie Birse, individually and as a representative of participants and beneficiaries of the CenturyLink Dollars & Sense 401(k) Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 et seq., on behalf of the Plan against the Plan Sponsor, Defendant CenturyLink, Inc. ("CenturyLink"), the Plan's investment fiduciary, CenturyLink Investment Management Company ("CIM"), the Plan Administrator, CenturyLink Employee Benefits Committee (the "Committee"), Marina Pearson, and the past and present members of the Committee (collectively the "CenturyLink Defendants") for breaching their fiduciary duties in the design, management, operation and administration of the Active Large Cap U.S. Stock Fund offered as a Plan investment option.

### INTRODUCTION

1.      In 2011, CenturyLink appointed its subsidiary CenturyLink Investment

Management ("CIM") as its plan investment fiduciary. In 2012 CIM formed the CenturyLink, Inc. Defined Contribution Plan Master Trust ("Master Trust") and merged the assets of its two 401(k) plans into the Master Trust.

2. Through the Master Trust, CIM established the investment options for the Plan, which consisted of a number of custom funds designed by CIM. The mix of passively and actively managed funds offered as Plan investments included an Active Large Cap U.S. Stock Fund (the "Large Cap Fund"). The objective of the Large Cap Fund was to "exceed the return of a broad market index of the largest 1,000 companies using an actively managed multi-manager approach." CIM hired six different investment firms to manage the Large Cap Fund.

3. The Large Cap Fund has consistently under-performed its benchmark index, the Russell 1000 Stock Index by two percent or more each year since it was formed in 2012. Although two percent seems like a minor amount, the U.S. Department of Labor has noted that a 1% lower return over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[1]

4. The underperformance of the Large Cap Fund was virtually guaranteed because it contained a serious design flaw from inception. This design flaw was built-in by CIM by using six different fund managers with the same mandate (five active and one passive). The odds of the five active managers outperforming the market in aggregate was highly remote due to the efficiency of the large cap domestic equity market and the difficulty of even one manager outperforming for more than a year.

5. Because of the highly efficient nature of the large cap domestic equity market, companies are generally fairly valued and excess returns are hard to produce over time.

---

[1] Available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/401kFeesEmployee.pdf

Furthermore, the five active managers would inevitably take competing positions and cancel out each other's strategy. Effectively, the fund managers will be trading stocks among themselves as one manager overweights a stock that another manager chooses to underweight.

6. In such an efficient market, it was unreasonable for CIM to expect five active managers to outperform in aggregate. Indeed, even in an optimistic scenario, it would have only been reasonable to assume the strategy would effectively turn the actively managed Large Cap Fund into an expensive large cap domestic index fund. This also would have been unreasonable given the existence of the U.S. Stock Index Fund, a fund heavily weighted to large cap equities, as a plan option.[2]

7. The impact of the underperformance of the Large Cap Fund was magnified by CIM's other investment option choices. The Large Cap Fund was one of only three stock funds offered by the Plan and the only large cap stock investment option. Moreover, the Large Cap Fund comprised up to 16% of the underlying investments in each of the target date funds offered by the Plan, which reduced the performance of those funds as well.

8. As an investment professional, CIM knew or should have known that the Large Cap Fund's design was flawed and underperforming. The Plan fiduciaries breached their duty of prudence by failing to replace or restructure the Large Cap Fund for five years despite its poor design and performance.

## JURISDICTION AND VENUE

9. This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action under 29 U.S.C. §§ 1132(a)(2) and (3) for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

---

[2] U.S. Stock Index Fund tracked the Russell 3000 Index, which has virtually identical performance to the S&P 500 Index.

10. This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b), because CenturyLink and CIM are headquartered in and can be found in this District, and the alleged breaches of the duties imposed by ERISA occurred in this District.

11. The Court has specific personal jurisdiction over all CenturyLink Defendants because they provided services for the Plan in this district and/or they engaged in the conduct described herein which took place in and/or was specifically directed towards Plan participants in this District.

## PARTIES

### The Plan

12. The CenturyLink Dollars & Sense 401(k) Plan is established and maintained by a written plan document as required by 29 U.S. C. §1102(a)(1).

13. The Plan is an "employee pension benefit plan" under 29 U.S.C. §1002(2)(A), and an "individual account plan" or "defined contribution plan" under 29 U.S.C. §1002(34). Employees who are eligible to participate in the Plan contribute to their individual accounts through payroll deductions.

14. As of December 31, 2016, the Plan had 35,785 participants and $3,687,832,382 in assets.

15. In 2012, the Plan's assets were transferred into the CenturyLink, Inc. Defined Contribution Plan Master Trust. The Plan owned 70% of the interest in the net assets of the Master Trust, and had $3,363,225,235 in assets invested in the Master Trust. The remaining 30% of the Master Trust is owned by the CenturyLink Union 401(k) Plan.

### Plaintiff

16. Plaintiff Bonnie Birse resides at 7461 Granada Road, Denver, Colorado 80221.

Ms. Birse is a participant in the CenturyLink Plan and has been since 2012. Ms. Birse is invested in the 2015 Target Date Fund.

## Defendants

17. CenturyLink, Inc. is a large, publicly traded telecommunications company (NYSE: CTL). CenturyLink is incorporated in Louisiana, but has offices and does business in Colorado. CenturyLink is the Plan Sponsor as defined under 29 U.S.C § 1002(16)(B). CenturyLink is a fiduciary of the Plan because upon information and belief, the CenturyLink Board of Directors has the sole authority to appoint and remove members of the CenturyLink Employee Benefits Committee, amend or terminate, in whole or part, the Plan or the Master Trust, and is designated as a fiduciary under the Plan.

18. The CenturyLink Employee Benefits Committee is the Plan Administrator under 29 U.S.C § 1002(16)(A)(i). The Committee is a Plan fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii) because the Committee has responsibility and discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income. The Committee is located in Vancouver, Washington.

19. Defendant Marina Pearson is a member of the Committee, along with other unknown persons. Ms. Pearson and the other Committee members are fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because as members of the Committee they have responsibility and discretionary authority to control the operation, management and administration of the Plan.

20.     Defendant CIM is a Colorado corporation headquartered in Denver, Colorado. CIM was organized in July, 2000 for the purpose of managing the investment of the assets of the Qwest Communications International, Inc. employee benefit plans. CIM was acquired by CenturyLink in April, 2011 when CenturyLink acquired Qwest, and is a wholly owned subsidiary of CenturyLink. CIM was registered with the Securities and Exchange Commission under the Investment Advisors Act of 1940 from 2000 through 2016. CIM is a fiduciary to the Plan under 29 U.S.C. § 1002(38) because it was appointed as the Plan Investment Fiduciary by CenturyLink in November 2011.

21.     CenturyLink, the Committee and Ms. Pearson are collectively referred to as the "CenturyLink Defendants."

## FACTS

22.     CenturyLink is a multi-billion dollar publicly traded telecommunications company. According to CenturyLink's Form 10-K for fiscal year 2016, CenturyLink had more than $17 billion in operating revenue and $622 million in net income.

23.     A defined contribution plan is a type of retirement plan with individual accounts for each employee, funded regularly by employee contributions that are invested on their behalf. At retirement, the employee receives the balance of his or her account, adjusted for any investment gains or losses. A 401(k) plan is a type of defined contribution plan. CenturyLink sponsors and maintains two participant-directed defined contribution 401(k) retirement plans for the benefit of its employees:

    a.     The CenturyLink Dollars & Sense 401(k) Plan; and

    b.     The CenturyLink Union 401(k) Plan (the "Union Plan").

24.     CIM was named the Plan Investment Fiduciary on November 15, 2011. On April

1, 2012 CIM formed the Master Trust and transferred the assets of the Plan and the Union Plan into the Master Trust. The Master Trust had assets of $4,803,625,986 on December 31, 2016, 70% of which were owned by the Plan and 30% by the Union Plan.

25. CIM manages the Master Trust and designs the custom investment funds offered to the Plan and the Union Plan participants through the Master Trust. The Plan offers a total of 12 target date funds, three bond funds, a money market fund, three domestic stock funds, two international funds and a CenturyLink Company Stock Fund.

26. The three domestic stock funds offered by CenturyLink are the Active Large Cap U.S. Stock Fund, the U.S Stock Index and the Active Small Cap U.S. Stock Fund.

27. The Large Cap Fund is an actively managed fund designed to "exceed the return of a broad market index of the largest 1,000 companies in the U.S. using an actively managed multi-manager approach." The fund performance benchmark is the "Russell 1000 Stock Index, an index considered representative of large-capitalization stocks."

28. Actively managed funds have higher expense ratios than index funds, which lowers the rate of return to investors. The Large Cap Fund charged investment management fees of .41% of net assets annually. By way of comparison, the CenturyLink U.S. Stock Index Fund charged management fees of .07% of net assets annually.

29. The large-cap universe is relatively small, consisting of less than nine percent of all stocks. Large cap stocks are closely followed; the majority of Wall Street research is aimed at large cap publicly traded companies. Because of the amount of publicly available information, the potential for finding undervalued stocks in the large cap market is remote. This is known as an efficient market.

30. Because of the efficient nature of the large cap domestic equity market, the large

cap indexes such as the S&P 500 and the Russell 1000 are very difficult to outperform. Fund managers, active traders, and other institutional investors have failed to consistently outperformance of the market. In each year for the five-year period starting January 1, 2011 and ending December 31, 2016, 88.3% of large-cap managers underperformed their respective benchmarks. Less than one percent of large-cap managers consistently outperformed their benchmarks over a five year period. For this reason, large cap domestic equity index funds have consistently outperformed almost all active large cap equity managers over five and 10 year periods.

31. CIM selects the managers of the Large Cap Fund and manages the allocation of assets to each manager. As of March, 2017, the Large Cap Fund assets were allocated between four different investment firms, an actively managed mutual fund, and a large cap index fund:

    a. Cornerstone Investment Partners: 17%

    b. Fiduciary Management: 30%

    c. Ivy Investment Management Company: 26%

    d. Systematic Financial Management: 7%.

    e. T. Rowe Price Institutional Growth Fund: 15%

    f. State Street Global Advisors Russell Large Cap Index Fund: 4%.

32. CIM designed the Large Cap Fund using a multiple manager approach "in order to provide exposure to different styles of portfolio management," "increased resources" and "a broader range of investment ideas." "Multiple managers also reduce the risks associated with a single manager," giving the Large Cap Fund "a higher likelihood of meeting its objective." The managers of the Large Cap Fund "seek to add returns above the benchmark through actively selecting stocks and favoring investment styles they believe will outperform the benchmark over

long periods of time."

33. The use of multiple fund managers tend to make funds perform more like an index fund, which contradicts the goal of seeking to outperform the benchmark. Research shows fund performance drops when funds switch from being run by a single manager to two or more. The more managers a fund has, the worse its performance is compared with a product run by a single portfolio manager.

34. Thus, by reducing the "risk" of having a single manager through using multiple managers, CIM actually reduced the likelihood that the Large Cap Fund would actually outperform its benchmark.

35. Less than 11% of fund managers outperform their benchmarks in the large cap space. The odds of any five different investment managers doing so in a given year are highly remote.

36. Moreover, CIT allowed each investment manager to invest a portion of the Large Cap Fund "favoring investment styles they believe will outperform the benchmark over long periods of time." There are three primary investment strategies: over or underweighting certain sectors, over or underweighting individual companies within sectors, or both. By allocating capital to five different managers using five different strategies, it is a virtual certainty that the strategies would conflict and offset each other. This would tend to cancel the effect of active management over time.

37. A simple example would be a manager overweighting the energy sector and another manager underweighting it, or for individual securities, one manager overweighting the shares of Apple and another manager underweighting it. If this likely scenario were to come to pass, the two managers would be just trading Apple stock between them, which adds transaction

costs and reduces returns of the Large Cap Fund.

38.     The performance of the Large Cap Fund compared to its benchmark, the Russell 1000, clearly shows the defective design of the Large Cap Fund. Since its inception on April 1, 2012, through March 31, 2017, the Large Cap Fund consistently and significantly underperformed its benchmark:

| Annualized | 1 Year | 3 Year | 5 Year | **Since Inception** 4/1/12 |
|---|---|---|---|---|
| Active Large Cap U.S. Stock Fund | 15.79 | 6.66 | 11.15 | 11.15 |
| Russell 1000® Stock Index | 17.43 | 9.99 | 13.26 | 13.26 |
| Difference | -1.64 | -3.33 | -2.11 | -2.11 |

39.     The Large Cap Fund underperformed its benchmark by 2.11% over the five year period since its inception in 2012. As a result, Plan participants who invested in the Large Cap Fund realized significantly lower returns on their investments. Using compounding returns, a plan participant investing $10,000 over five years would have realized an additional $1,680 if the Large Cap Fund performed up to its benchmark.[3]

40.     By contrast, the actively managed T. Rowe Price Institutional Growth Fund, which makes up 15% of the Large Cap Fund, outperformed large Cap Fund through March 31, 2017:

|  | 1 Year | 3 Year | 5 Year |
|---|---|---|---|
| T. Rowe Price Institutional Growth Fund | 21.72 | 10.77 | 14.08 |
| Russell 1000® | 15.79 | 6.66 | 11.15 |

---

[3]Ten-thousand dollars grows to $18,640 if compounded at the index rate instead of $16,960 if compounded at the Large Cap Fund rate.  The actual numbers would be different due to the fact that the average return was not earned each year.

| Stock Index | | | |
|---|---|---|---|
| Difference | 5.93 | 4.11 | 2.93 |

41.     Had CIM offered the T. Rowe Price Institutional Growth Fund as a stand-alone active investment option instead of the defectively designed Large Cap Fund, Plaintiff and other Plan participants would have realized significantly higher returns on their investment. For example, using compound returns, a person investing $10,000 over five years would have realized an additional return of $2,360 if s/he had invested in the T. Rowe Price Institutional Growth Fund instead of the Large Cap Fund.[4]

42.     Investors in the Large Cap Fund were not the only ones affected by the Large Cap Fund's poor performance; the CenturyLink Plan Target Date Funds also had the Large Cap Fund as part of their asset allocations. The following table shows the increased amount of return for the target Date Funds over a five year period based on the underperformance of the Large Cap Fund:[5]

| **CenturyLink Plan Fund** | **% Allocated to Large Cap Fund** | **% Difference in in Return** |
|---|---|---|
| Conservative Retirement Fund | 9% | 0.19% |
| Retirement Fund | 12% | 0.25% |
| 2015 Target Date Fund | 15% | 0.32% |
| 2020 Target Date Fund | 16% | 0.34% |
| 2025 Target Date Fund | 16% | 0.34% |

---

[4] Ten-thousand dollars grows to $19,320 if compounded at the T Rowe Price Institutional Growth Fund rate instead of $16,960 if compounded at the Large Cap Fund rate. The actual numbers would be different due to the fact that the average return was not earned each year.

[5] Assumes a constant allocation to the Large Cap Fund and a 2.11 percent average underperformance.

| | | |
|---|---|---|
| 2030 Target Date Fund | 16% | 0.34% |
| 2035 Target Date Fund | 16% | 0.34% |
| 2040 Target Date Fund | 16% | 0.34% |
| 2045 Target Date Fund | 16% | 0.34% |
| 2050 Target Date Fund | 16% | 0.34% |
| 2055 Target Date Fund | 16% | 0.34% |
| 2060 Target Date Fund | 16% | .48% |

43. Using the five-year performance, a plan participant investing $10,000 in the 2020 Target Date Fund would have realized an additional return of $230 had the Large Cap Fund performed up to its benchmark.[6]

### ERISA'S Fiduciary Standards

44. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Pioneer Defendants as Plan fiduciaries. Under ERISA, a fiduciary is expected to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." *See* 29 U.S.C. § 1104(a)(1)(A)(I).

45. A "prudent" fiduciary, in discharging his or her duties, also must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," *see* 29 U.S.C. § 1104(a)(1)(B

---

[6] Ten-thousand dollars grows to $14,280 if compounded at the higher rate instead of $14,050 if compounded at the actual 2020 Target Date Fund rate. The actual numbers would be different due to the fact that the average return was not earned each year.

46. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for (1) knowingly participating in a breach by another fiduciary; (2) enabling a breach by another fiduciary; or (3) knowing of a breach of duty by another fiduciary, fails to cure such breach of duty.

47. Plan fiduciaries have "a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l,* __ U.S. __, 135 S. Ct. 1823, 1828 (2015).

48. 29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

49. Section 1109(a) provides a breaching fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary," and "shall be subject to such other equitable or remedial relief as the court may deem appropriate."

## CLASS ACTION ALLEGATIONS

50. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). Plaintiff has standing to bring these ERISA claims because there is a causal connection between the CenturyLink Defendants' actions and actual harm to an ERISA Plan in which Plaintiff participate or participated. "A plaintiff may seek relief under § 1132(a)(2) that sweeps beyond his own injury.*" Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585,

592-593 (8th Cir. 2009); *see also DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 256 (2008) (§ 1132(a)(2) does not provide a remedy for individual injuries distinct from plan injuries).

  51. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following class (the "Class"):

> All participants and beneficiaries of CenturyLink Dollars & Sense 401(k) Plan from April 1, 2012 through the date of judgment, excluding the Defendants, who invested in the Active Large Cap U.S. Stock Fund directly or indirectly through another Retirement or Target Date Fund.

  52. This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

  a. The Class may include more than 35,000 members and is so large that joinder of all members is impracticable.

  b. There are questions of law and fact common to the Class because the CenturyLink Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light

of the CenturyLink Defendants' breach of duty.

c. Plaintiff's claims are typical of the claims of the Class because Plaintiff was a Plan participants during the time period at issue in this action and all class members were harmed by the CenturyLink Defendants' misconduct. Plaintiff has claims that are typical of the claims of the Class because all participants who invested directly in the Active Large Cap U.S. Stock Fund or indirectly through the Retirement or Target Date Funds were harmed by the CenturyLink Defendants' misconduct.

d. Plaintiff will adequately represent the Class because she is a participant in the Plan and invested indirectly in the Active Large Cap U.S. Stock Fund through the Retirement or Target Date Funds during the Class period, has no interest that is in conflict with the class members, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for the CenturyLink Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would

substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

53. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

54. Plaintiff's counsel, Franklin D. Azar & Associates, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## FIRST CLAIM FOR RELIEF
**(Breach of Duty of Prudence Against CIM, the Committee and Pearson)**

55. The preceding allegations are incorporated by this reference.

56. The Committee and Pearson, as Plan Administrators, had responsibility and discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

57. CIM was appointed as the Plan Investment Fiduciary in November 2011, and is a fiduciary to the Plan under 29 U.S.C. 1002(38). CIM owed a duty to the Plan and its participants to select prudent investment options, evaluate and monitor the Plan's investments on an ongoing basis and eliminate imprudent ones, and take all necessary steps to ensure that the Plan's assets were invested prudently.

58. As the Investment Fiduciary, CIM designed, implemented and monitored the CenturyLink proprietary funds, including the Large Cap Fund, offered by the Plan to Plan participants.

59. CIM designed, and offered, a defective Large Cap Fund investment option to CenturyLink plan participants, by structuring it to allocate invested capital to six different managers with the same large cap domestic equity mandate. CIM, as an experienced investment advisor, knew or should have known the design of the Large Cap Fund was defective and that the large Cap Fund objectives could not be realized by using multiple investment managers with the same mandate.

60. The Large Cap Fund consistently underperformed its benchmark by 2% or more over every year since its inception in 2012. However, despite this poor performance, CIM failed to restructure or replace the Large Cap Fund.

61. CIM failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent industry professional, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, and therefore breached its fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

62. The Committee and Pearson, as Plan Administrators, were responsible for CIM's

actions because they knew CIM's acts were a breach of its fiduciary duty, enabled the CIM to commit the breach by failing to lawfully discharge their own fiduciary duties, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, the Committee and Pearson are liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

63. Plaintiff and the class members have been damaged by CIM, the Committee and Pearson's breach of their fiduciary duty to the Plan.

## SECOND CLAIM FOR RELIEF
### (Failure to Monitor Fiduciaries Against CenturyLink)

64. The preceding allegations are incorporated by this reference.

65. CenturyLink, as the Plan Sponsor, is responsible for the appointment and removal of the Committee to serve as Plan Administrator.

66. Because of that authority, CenturyLink has a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Committee.

67. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not doing so.

68. To the extent any of CenturyLink's fiduciary responsibilities were delegated to another fiduciary, CenturyLink's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

70. CenturyLink breached its fiduciary monitoring duties by, among other things, failing to monitor CIM and the Committee to make sure the Large Cap Fund was properly designed and fulfilling its stated investment objectives.

71. As a consequence of CenturyLink's breaches of its fiduciary duty to monitor, the Plan suffered significant underperformance. Had CenturyLink discharged its fiduciary monitoring duties prudently as described above, the underperformance suffered by the Plan would have been avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, Plaintiff and the other Class members, lost millions of dollars in their retirement savings.

## PRAYER FOR RELIEF

Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests the Court:

- certify the Class, appoint Plaintiff as class representative, and appoint Franklin D. Azar & Associates P.C. as Class Counsel;
- find and declare that the CenturyLink Defendants have breached their fiduciary duties as described above;
- find and adjudge that CenturyLink Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;
- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;
- order the CenturyLink Defendants to provide an accounting necessary to determine the amounts the CenturyLink Defendants must make good the Plan under §1109(a);
- award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;
- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

Dated this 30th day of November, 2017.

                Franklin D. Azar & Associates, P.C.

                By:    /s/ Paul R. Wood
                         Franklin D. Azar
                         H. Zachary Balkin
                         Paul R. Wood
                         14426 East Evans Avenue
                         Aurora, CO 80014
                         Telephone: (303) 757-3300
                         Facsimile: (303) 757-3206
                         azarf@fdazar.com
                         balkinz@fdazar.com
                         woodp@fdzar.com