**IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:17-cv-02872-CMA-NYW

BONNIE BIRSE AND GERAD DETWILER, on behalf of themselves and all similarly
situated participants and beneficiaries of the CenturyLink Dollars & Sense 401(K) plan,
    Plaintiffs,

v.

CENTURYLINK, INC., and CENTURYLINK INVESTMENT MANAGEMENT COMPANY,
    Defendants.

---

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AS TO DEFENDANTS' BREACH OF FIDUCIARY
DUTY FOR FAILURE TO MONITOR**

---

CenturyLink and CenturyLink Investment Management Company ("CIM")

(collectively, "Defendants") owed a duty to the Plaintiffs and the Class to ensure that the

Plaintiffs' retirement funds were invested in a prudent and appropriate manner. The

Defendants breached that duty by designing the Active Large Cap U.S. Stock Fund

("ALCF," "Large Cap Fund" or the "Fund"), which mirrored a low-cost index fund, but

unlike an index fund charged high fees. ¶20.[1] The Large Cap Fund underperformed

immediately and consistently due to its flawed and imprudent design, and CIM failed to

appropriately monitor and adjust the Fund because it lacked any formal processes or

guidelines for doing so. CenturyLink, as the plan sponsor and a co-fiduciary, in turn failed

in its duty to monitor CIM. The Defendants collectively failed to put into place any policies,

procedures, or processes to guide employees towards prudent decision-making in

---

[1] References to "¶__" or "¶¶__" are to paragraphs in the Statement of Facts section
incorporated below, unless otherwise noted.

creating the Fund, monitoring the Fund or making prudent adjustments as needed. As a result, the Plaintiffs and the Class have suffered damages in the form of losses to their retirement savings.

Plaintiffs Bonnie Birse and Gerad Detwiler ("Plaintiffs"), by and through counsel, respectfully move this Court for an order granting summary judgment in favor of the Plaintiffs against CenturyLink and CIM for Breach of Fiduciary Duty for Failure to Monitor.[2]

## INTRODUCTION

Under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 et seq., CIM breached their fiduciary duties to the participants and beneficiaries of the CenturyLink Dollars & Sense 401(k) Plan (the "Plan"), by failing to prudently design, manage, operate, monitor, and adjust the Large Cap Fund as a Plan investment option. For reasons set forth in this memorandum, the Court should grant summary judgment in favor of the Plaintiffs as to Defendant CIM's breaches of its fiduciary duties for failure to prudently design and monitor the Plan, and CenturyLink's breaches in its failure to monitor CIM.

Plaintiffs bear the burden of proof for breach of fiduciary duty. The elements of the claim are (1) the Defendants are plan fiduciaries; (2) the Defendants breached their

---

[2] Plaintiffs bring this motion in accordance with the Courts' Scheduling Order. Dkt. #100, April 17, 2019. Currently, the Defendants have not served an answer containing any affirmative defenses. Should the Defendants assert any affirmative defenses, the Plaintiffs will ask the Court for leave to file for summary judgment on those defenses, if appropriate. Additionally, the Court has not yet ruled on Plaintiffs' Motion for Class Certification. Dkt. #126, August 15, 2019 (amended on August 27, 2019 per the Court's request at Dkt. #131). Due to potential issues with the one-way intervention rule, Plaintiffs ask the Court to defer ruling on this Motion until after the ruling on class certification and any opt-out period has elapsed.

fiduciary duties; and (3) a cognizable loss to the participants or the plan resulted. *See* 29 U.S.C. § 1132(a)(2). This memorandum will lay out the proof for each element along with undisputed material facts in support of Plaintiffs' claim.

Defendants lacked functional processes for nearly every aspect of designing, implementing, monitoring and adjusting the Large Cap Fund. ¶37. They had no functional or formal guidelines or processes designed to prudently implement the results of their research and structure the Fund in a way that could be expected to meet its stated objective. Defendants also had no written guidelines or formal processes designed to ensure that prudent decisions were made in how many fund managers were used, which fund managers were chosen, how managers were to be monitored, how adjustments were to be made, or how the long-term strategy was expected to work over the course of a "market cycle." ¶48. Without oversight or written policy guidance, one employee (Paul Strong) had unguided and unfettered discretion in management of the Fund. ¶¶65-72, 79.

CIM further lacked any processes or procedures designed to rigorously evaluate the Fund's original strategy, subsequent changes in strategy, the current business market, or economic environment. Nor was there any process to evaluate how the Fund's strategy would be likely to perform in the anticipated upcoming environment. Accordingly, CIM failed to rigorously test the fund strategy or the likely performance of the specific lineup of managers they chose to manage the Fund's assets. If they had rigorously tested these factors, CIM would have found it had a very low, almost impossible, likelihood of achieving the outperformance investment objective. ¶¶55-56.

There is no genuine dispute to the fact that Defendants lacked functional, formal or written processes for ensuring prudent decision-making in the creation or administration of the Plan. This amounts to a breach of fiduciary duty, as the Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries. Specifically, Defendants breached their fiduciary duties to Plaintiffs by:

1) failing to adopt and apply an investment policy statement (IPS) for the Plan (¶79);

2) failing to cause CIM to adopt and apply written policies and procedures governing the management of the Plan's investments (¶80);

3) failing to establish prudent documented investment selection criteria, as would be found in an IPS, to be applied on a consistent basis to the selection of the Plan's investments, including the Large Cap Stock Fund, the Target Date Funds and investment managers, particularly Cornerstone Investment Partners (¶81);

4) permitting the bias of senior CenturyLink management towards active management to influence their investment decisions (¶82);

5) adopting active investment management strategies without evaluating and justifying the additional cost of such strategies in relation to the cost of passive investment strategies (¶83);

6) failing to establish prudent written investment monitoring criteria to be applied on a consistent basis to the monitoring of the Plan's investments,

including the Large Cap Stock Fund, the Target Date Funds, and investment managers, particularly Cornerstone Investment Partners (¶84);

7) failing to apply a prudent monitoring process to the Plan's investments and managers, particularly Cornerstone Investment Partners (¶85);

8) failing to evaluate and consider alternative strategies and managers when the Large Cap Stock Fund experienced consistent underperformance relative to applicable benchmarks, (¶86);

9) failing to maintain minutes of CIM's investment committee meetings or otherwise document deliberations and reasoning for fiduciary decisions; ¶¶39, 87).

10) failing to adopt and consistently apply policies and procedures to address funds or strategies that did not meet benchmark expectations or exhibited other shortfalls in relation to selection criteria (¶88); and

11) failing to apply prudent monitoring and oversight of investment activities. (¶89).

## STATEMENT OF FACTS

### A. Background of the Parties, the Plan, and the Fund

1.      The CenturyLink Dollars & Sense 401(k) Plan ("the Plan") is a defined contribution plan sponsored by CenturyLink. Movant's Appx., p. 10 - Exhibit 23[3] at CL 00057089.

---

[3] "Exhibit" references continuously-numbered Deposition Exhibits offered by the Parties.

2.      "The Plan enables eligible CenturyLink employees to save for retirement by investing a portion of their compensation through individual Plan accounts in one or more investment funds offered in the Plan's investment lineup." Movant's Appx., p. 43 - Expert Report of Roger L. Levy, LLM, AIFA ®, dated October 10, 2019 ("Levy Report"), ¶52.

3.      At the time of its creation, the Plan had 48,257 participants and $3.4 billion in net assets as of December 31, 2012. Movant's Appx., p. 120 - Form 5500 12/31/12, CL00000388.

4.      As of December 21, 2017, the Plan had 34,274 participants and nearly $5.7 billion dollars in net assets. Movant's Appx., pp. 42-43 - Levy Report, ¶51.

5.      Beginning in April 2012, CIM began offering a new investment lineup which included a company stock fund and nine core investment options ("Core Funds"), including the Active Large Cap U.S. Stock Fund ("Large Cap Fund"). Movant's Appx., pp. 170, 179 - Exhibit 3 at CL 00006607, 16.

6.      CenturyLink Investment Management Company ("CIM") is a wholly-owned subsidiary of CenturyLink, and operates as in-house investment fiduciary for the various employee benefit and welfare plans sponsored by CenturyLink. Movant's Appx., p. 43 - Levy Report, ¶54.

7.      The Plan is established and maintained by a written plan document as required by 29 U.S.C. §1102(a)(1). Dkt. #36, Ex. A-B.

8.      The Plan is an "employee pension benefit plan" under 29 U.S.C. §1002(2)(A), and an "individual account plan" or "defined contribution plan" under 29 U.S.C. §1002(34). Dkt. #36, Ex. A-B.

9.      Plaintiff Bonnie Birse is currently a participant in the CenturyLink Plan and has been since before 2012 and invested in the 2015 Target Date Fund since 2012. Third Amended Complaint (Dkt. #94), ¶¶13, 22.

10.     Plaintiff Gerad Detwiler was a participant of the CenturyLink Plan from January of 2015 to July of 2017, and invested directly in the Large Cap Fund. Third Amended Complaint, ¶¶14, 23.

11.     The Target Date Funds each had significant holdings in the Large Cap Fund. Movant's Appx., p. 328 - Expert Report of John J. Duval, Jr., dated October 11, 2019 ("Duval Report"), ¶556; Movant's Appx., pp. 333, 346 - CL 00015361, CL 00057468.

## B. **The Fund's Structure and Performance**

12.     The Active Large Cap U.S. Stock Fund ("ALCF") Objective and Fund Management was described as follows: "The Active Large Cap U.S. Stock Fund's objective is to exceed the return of a broad market index of the largest 1,000 companies in the U.S. using an actively managed multi-manager approach. The managers of the Fund seek to add returns above the benchmark through actively selecting stocks and favoring investment styles they believe will outperform the benchmark over long periods." Movant's Appx., p. 219 - Duval Report, ¶89 (citing Movant's Appx., p. 347 - CL 00000316).

13.     From inception, the ALCF had a style-based strategy and was expected to generate excess returns over one percent annually. Movant's Appx., pp. 249-250 - Duval Report, ¶223 (citing Movant's Appx., p. 350 - CL 00007437).

14.     The Large Cap Fund was imprudently designed, in part, because it was overdiversified. Movant's Appx., pp. 239-241 - Duval Report, ¶¶180-188, Chart 10.

15.     "The overdiversification took two forms: 1) The use of seven different managers within the ALCF; and, 2) The large allocation to three "core" managers and the index itself." Movant's Appx., p. 243 - Duval Report, ¶201.

16.     "Growth stock investors usually pay a high premium to hold such stocks because the market realizes the superior qualities of the company. The assumption behind growth stock investing is that the market will continue to reward the superior grower. The

key to success for a growth stock manager is realizing when that superior growth pattern may deteriorate." Movant's Appx., p. 241 - Duval Report, ¶190 (citing *Style Investing: Unique Insight Into Equity Management*; Richard Bernstein; John Wiley & Sons, Inc.; New York, 1995; 45-7).

17.     "[T]he ALCF was, by mandate, to invest in U.S. equities so as to outperform the Russell 1000 Index. This eliminated any asset class decision (for example, investing in bonds, currencies, or commodities) and also eliminated international equities," so "there were only two significant portfolio management decisions that CIM needed to make at any time: 1) The size weighting, and; 2) The style weighting." Movant's Appx., pp. 241-242 - Duval Report, ¶¶192-193.

18.     "CIM failed to express meaningful size and style overweights and overdiversified the ALCF, to a large degree replicating the Russell 1000 benchmark it was tasked with outperforming." Movant's Appx., p. 243 - Duval Report, ¶199.

19.     The Fund design's overdiversification and extremely high correlation to the Russell 1000 made it almost certain that the Fund could not outperform the index. Movant's Appx., p. 247, Duval Report, ¶¶211-214.

20.     The Large Cap Fund's fees were 45 basis points, 15 times higher than the highly-correlated U.S. Stock Index Fund (3 basis point fees). Movant's Appx., pp. 247-248 - Duval Report, ¶¶215-218 (citing Movant's Appx., p. 351 - CL 00001637), Chart 14.

21.     From its inception, the Large Cap Fund underperformed its benchmark on rolling one-, three-, and five-year periods. Movant's Appx., p. 215 - Duval Report, ¶78.

22.     By the time the Large Cap Fund was eliminated, it had underperformed its benchmark in 17 of 21 quarters. Movant's Appx., pp. 268-269 - Duval Report, ¶299.

C. **CenturyLink and CIM are Fiduciaries of the Plaintiffs.**

23.     In 2011, CenturyLink appointed CIM as its Plan Investment Fiduciary, making CIM a Named Fiduciary. Movant's Appx., p. 43 - Levy Report, ¶54.

24.     "CenturyLink retained the non-delegable duty to select an appropriate fiduciary to act as an Investment Manager and to monitor the Investment Manager's activities 'to ensure its activities are in the best interests of the plan participants' and would retain general co-fiduciary responsibility under ERISA." Movant's Appx., p. 43 - Levy Report, ¶55 (citing Movant's Appx., p. 360 - Exhibit 6 at CL 00014850; Movant's Appx., p. 366 - Exhibit 24 at CL 00014856).

25.     "[W]here a plan sponsor has appointed an investment committee and/or administrative committee or has otherwise allocated fiduciary responsibility to a named fiduciary for managing the plan's investments, the plan sponsor (usually through its board of directors) has a separate duty to monitor those committees or named fiduciary to ensure they are fulfilling their fiduciary responsibilities," including reviewing committee minutes, the Investment Policy Statement ("IPS"), and other records, as well as receiving periodic reports or presentations from the committee or named fiduciary. Movant's Appx., p. 42 - Levy Report, ¶50.

26.     "To deal prudently with a fund which fails to meet the criteria defined in the IPS, a prudently crafted IPS will include procedures to guide the investment committee in determining whether to retain, freeze from further contributions, or terminate a fund or manager." Movant's Appx., p. 41 - Levy Report, ¶48.

27.     CIM had no written investment policy statement for the 401(k) Plan, and no written policies or procedures governing the strategizing, implementation, or monitoring of the Plan. Movant's Appx., pp. 377, 409-410 - Deposition of Kathleen Lutito (Sept. 18-19, 2019) ("Lutito") at 58:11-21, 195:10-196:17.

28.     CenturyLink had the authority to terminate and/or replace the investment managers at CIM, or to terminate and/or replace CIM as the investment manager for the fund. Movant's Appx., p. 430-431 - Deposition of Shane Matson (Sept. 12, 2019) ("Matson") at 63:24-64:9; Movant's Appx., pp. 455-458 - Deposition of Mary Beth Gorrell (July 17, 2019) ("Gorrell") at 90:5-93:5, Movant's Appx., p. 352 - Exhibit 6; Movant's Appx., pp. 375-376 - Lutito at 54:21-55:20.

29.     Key CIM employees share dual positions at both CenturyLink and CIM. Movant's Appx., p. 426 - Matson at 9:12-19, Movant's Appx., p. 373 - Lutito at 12:5-18, Movant's Appx., pp. 475-476 - Deposition of John Litchfield (Sept. 20, 2019) ("Litchfield") at 12:11-13:25; Movant's Appx., pp. 440-445 - Gorrell at 23:1-28:7; Movant's Appx., p. 352 - Exhibit 6.

30.     "CIM had two different types of fiduciary duties: 1) Plan-level, which concerned the CenturyLink Dollars & Sense 401(k) Plan as a whole and the top-down supervision of the entire menu of investment options within the Plan, and; 2) Fund-level, which concerned the management of individual investment options within the Plan, such as the ALCF." Movant's Appx., p. 217 - Duval Report, ¶¶82-83, Movant's Appx., p. 489 - Exhibit 7 at CL 00006661.

31.     "[U]nder ERISA, the prudent man rule is known as the 'prudent expert' rule because the standard is not just one of prudence that would be applied by a conscientious layman, but prudence applied by an expert in the field, acting in the same position, with the same goals." Movant's Appx., p. 217 - Duval Report, ¶84.

32.     The Department of Labor has elaborated on the prudent expert standard, writing: "the courts have evaluated the prudence of a fiduciary's actions under ERISA by focusing on the process the fiduciary used to reach its determination or recommendation – whether the fiduciary, 'at the time they engaged in the challenged transactions,

employed the proper procedures to investigate the merits of the investment and to structure the investment.'" Movant's Appx., p. 218 - Duval Report, ¶86 (citing Federal Register Vol. 81, No. 68).

33.     CIM acknowledged that it was held to the "Prudent Man Rule" meaning that in creating, offering, and monitoring the Plan it "must act 'with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the investment of a fund of like character and with like aims.'" Movant's Appx., p. 217 - Duval Report, ¶¶83-84 (citing Movant's Appx., p. 489 - Exhibit 7).

### D. CenturyLink and CIM Breached their Fiduciary Duty by Not Having Written Policies and Procedures in Place to Evaluate the Fund's Performance

34.     "Documentation of a 401(k) plan's investment process is a fundamental best practice." Movant's Appx., pp. 47-48 - Levy Report, ¶62.

35.     An Investment Policy Statement "for a predecessor plan was prepared bearing a date of December 22, 2010, but an IPS in such form or similar was never adopted by the Plan." Movant's Appx., pp. 44-45 - Levy Report, ¶57 (citing Movant's Appx., p. 494 - CL00067999; Movant's Appx., p. 502 - Exhibit 63).

36.     The establishment of IPS in other predecessor and concurrent plans "demonstrates that CIM knew of this best practice but CIM failed to recognize that it applied equally to a defined contribution plan such as the Plan." Movant's Appx., pp. 44-45 - Levy Report, ¶57.

37.     CIM lacked functional processes for nearly every aspect of designing, implementing, monitoring and adjusting the Large Cap Fund. Movant's Appx., pp. 409-410 - Lutito at 195:7-196:17; Movant's Appx., p. 203 - Duval Report, ¶¶179; 135-148;

167-169; 254, 304; 317; 322-323; 330; 358; 385-386; 397; 412-413; 425; 434; 439-441; 453; 459-489; 503; 525; 530-534; 539; 552-553.

38.     The lack of functional processes, oversight, and prudent decision-making extended to the inclusion of the Large Cap Fund in the Target Date Funds. Movant's Appx., pp. 329-331 - Duval Report, ¶¶559-566.

39.     CIM's investment committee kept no official minutes of its meetings. Movant's Appx., p. 394 - Lutito at 99:6-9.

40.     Mr. Strong, Mr. Matson and Ms. Lutito testified that they focused on investment performance over a business or market cycle, but this measure of performance is not articulated in the Strategy Summary or in the Investment Management Agreements for Cornerstone and Systematic. Movant's Appx., pp. 59-60 - Levy Report, ¶83, Movant's Appx., p. 537 - Deposition of Paul Strong (July 26, 2019) ("Strong") at 80:2-17; Movant's Appx., pp. 428-429 - Matson at 51:11-52:13; Movant's Appx., pp. 420-421 - Lutito at 235:24-236:1.

41.     The underperformance of the Large Cap Fund was of concern to CIM because it was a drag on the performance of the Target Date Funds. Movant's Appx., pp. 464-467, 469-472 - Gorrell at 113:12-116:13, 194:8-197:6, Movant's Appx., pp. 411-414 - Lutito at 224:2-227:24.

42.     The underperformance of managers in the Large Cap Fund, such as Cornerstone, was of concern to Director of Asset Allocation Mary Gorrell because it was a drag on the performance of the Target Date Funds. Movant's Appx., pp. 469-472 - Gorrell at 194:8-197:6.

43.     There are only two documents to detail the process CIM purportedly used to design the Fund: 1) The April 29, 2011 one-page backtest summary and accompanying charts (Movant's Appx., p. 573 - CL 00074394-402); and 2) The March 30, 2012 memo

written after the Fund design and introduction as an investment option in the Plan (Movant's Appx., p. 582 - CL 00005102-19). Movant's Appx., p. 222 - Duval Report, ¶109.

44.     Mary Gorrell, who had been managing or supervising 401(k) plans for CIM since 2010, testified that a range of procedures had been adopted but that she was unable to identify specific documentation of the purported procedures. Movant's Appx., p. 47 - Levy Report, ¶61; Movant's Appx., pp. 439, 459-463 - Gorrell at 12:4-6, 94:22 -98:10.

45.     "Mr. Paul Strong, Director of Public Markets, confirmed that there was nothing written with respect to CIM's investment process other than a few slides in a presentation of 'Active Management working notes' relative to the Global Equity Program." Movant's Appx., p. 47 - Levy Report, ¶61; Movant's Appx., pp. 514-516 - Strong at 35:5-37:7.

46.     "Kathy Lutito, CIM's Chief Investment Officer, testified that CIM had no written investment policy statement and had no other written policies and procedures for the Plan." Movant's Appx., p. 47 - Levy Report, ¶61; Movant's Appx., p. 409 - Lutito at 195:10-17.

47.     "The dearth of documents around the ALCF conception and design indicate the strategy was largely a creation of Paul Strong with little oversight from CIM." Movant's Appx., p. 222 - Duval Report, ¶111; Movant's Appx., pp., 477-481 - Litchfield at 16:14-20:22.

48.     CIM lacked any functional or formal guidelines or processes for how the Fund's strategy was created or implemented in a way that was expected to meet benchmarks, how many fund managers were chosen, which fund managers were chosen, how managers were monitored, how adjustments were to be made, and how the long-term strategy was expected to work over the course of a "market cycle." Movant's Appx.,

pp. 537-571 - Strong at 80:14-88:23, 95:16-120:7; Movant's Appx., pp. 378-393 - Lutito at 63:5-74:20, 83:6-86:11.

49.     Neither Lutito nor Strong could articulate any functional or formal guidelines or processes for how the Fund's strategy was created or implemented in a way that was expected to meet benchmarks, how many fund managers were chosen, which fund managers were chosen, how managers were monitored, how adjustments were to be made, and how the long-term strategy was expected to work over the course of a "market cycle." *Id.*

50.     "[T]here were no processes or procedures used by CIM to rigorously evaluate the original strategy or subsequent change in strategy, the current business, market, and economic environment, or how the new strategy would likely perform in the anticipated upcoming environment." "[T]he full magnitude of the strategy change appears to have only been known to ALCF manager Paul Strong." Movant's Appx., p. 227 - Duval Report, ¶¶128-129; Movant's Appx., pp. 482-485 - Litchfield at 31:25-34:20.

51.     Given the Fund's size, and CIM's scope, virtually the entire universe of money managers was available to the Fund, yet only pre-existing managers from the other CenturyLink plans were used. Movant's Appx., p. 231 - Duval Report, ¶¶140-141.

52.     No documents have been produced relating to any "calls, meetings, site visits, and quantitative analysis" as part of the evaluation of prospective or pre-existing managers. Movant's Appx., p. 232 - Duval Report, ¶144.

53.     No documents have been produced indicating any due diligence was conducted into the purported "bench managers" Paul Strong spoke of in deposition. Movant's Appx., p. 232 - Duval Report, ¶145, Movant's Appx., p. 572 - Strong at 162:4-11.

54.     There was an artificial limitation of managers to those pre-existing in the three plans, representing a flawed investment process that was contrary to industry practice and a failure to meet the standard of care of a prudent investment expert. Movant's Appx., p. 232 - Duval Report, ¶148.

55.     CIM failed to rigorously test the manager lineup they chose to manage the Fund's assets. Movant's Appx., pp. 232-233 - Duval Report, ¶¶149-154.

56.     If CIM had rigorously tested the lineup of managers and the strategy of the Fund, they would have found it had a very low, almost impossible likelihood of achieving the outperformance investment objective. *Id.*

57.     Two of the Fund's managers were seriously underperforming at the time the Fund was launched, which should have raised serious concerns about the Fund's strategy. Movant's Appx., pp. 233-234 - Duval Report, ¶¶155-158 (citing Movant's Appx., p. 600 - CL 00057086).

58.     The fact that the Fund launched with underperforming managers and 40% of the Fund in the Russell 3000 index was indicative that CIM lacked a process for designing, implementing, launching, and overseeing the Fund, or failed to follow any process that did exist. Movant's Appx., pp. 233-234 - Duval Report, ¶¶158-162.

59.     There was no formal or functional process for Lutito overseeing or managing Strong. Movant's Appx., pp. 400-405 - Lutito at 131:25-136:25.

60.     Reviews of the Fund strategy should "have been undertaken by someone other than fund manager Paul Strong, otherwise it would not be oversight." Movant's Appx., p. 319 - Duval Report, ¶521.

61.     "This function likely would have fallen to Kathleen Lutito, the CIM Senior Vice President, President, and Chief Investment Officer." Movant's Appx., p. 319 - Duval Report, ¶522; Movant's Appx., pp. 395-398 - Lutito at 104:18-107:10.

62.   "CIM did not have any rules for flagging a strategy that wasn't working." Movant's Appx., p. 320 - Duval Report, ¶523 (citing Movant's Appx., pp. 390-391 - Lutito at 83:25-84:6).

63.   CIM did not have any formal process or written policies for investment strategies, decision-making, or assessing managers. Movant's Appx., pp. 378-389 - Lutito at 63:9-74:20.

64.   "By failing to undertake meaningful and substantive strategy fit reviews, as specified in its own policies and procedures, CIM acted contrary to industry standards and failed to meet the standard of care of a prudent investment expert." Movant's Appx., p. 320 - Duval Report, ¶528.

65.   Paul Strong, principally responsible for designing the Large Cap Stock Fund, had experience previously concentrated primarily on working with the defined benefit plans, and he had not designed any defined contribution plan equity funds prior to 2012. Movant's Appx., pp. 52-53 - Levy Report, ¶70; Movant's Appx., pp. 517-519, 524 - Strong at 39:20-41:13, 67:14-20; Movant's Appx., p. 446 - Gorrell at 34:1-7.

66.   Paul Strong had unfettered authority to make decisions on strategy and implementation, and the hiring/removal of managers in the Fund. Movant's Appx., pp. 447-454, Gorrell at 69:24-73:24, 85:19-87:7.

67.   CIM failed to supervise Paul Strong. Movant's Appx., pp. 320-327 - Duval Report, ¶¶529-552.

68.   Strong counseled patience and staying the course despite consistent underperformance of the Fund. Movant's Appx., pp. 414-423 - Lutito at 227:6-24, 230:11-238:16.

69.   The CIM equity management process was almost entirely focused on the underlying investment managers, with no reflection built in for the fund strategy or fund

manager. Movant's Appx., p. 321 - Duval Report, ¶530, Chart 45 (Movant's Appx., p. 601 - CL 00009285).

70.     Other members of CIM's Investment Committee routinely deferred to Mr. Strong's judgment on all matters related to the Fund. Movant's Appx., p. 322 - Duval Report, ¶534; Movant's Appx., p. 468 - Gorrell at 121:1-25; Movant's Appx., pp. 427, 432, 435-436 - Matson at 27:7-14, 68:13-19, 156:9-157:3; Movant's Appx., pp. 486-487 - Litchfield at 52:5-53:22, 96:3-15; Movant's Appx., pp. 395-396, 398-399 - Lutito 104:18-105:19, 107:6-108:17.

71.     Vice President of Investment Management Shane Matson did not do any independent analysis of the driver biases presented by Strong to determine whether they were sound, nor did he know of anyone else doing so. Movant's Appx., pp. 433-436 - Matson at 69:24-70:22, 156:9-157:3.

72.     CIM could have given Mr. Strong additional support, but chose not to, as Strong and Lutito testified in their depositions. Movant's Appx., pp. 326-327 - Duval Report, ¶¶548-549, Movant's Appx., p. 406 - Lutito at 144:3-21, Movant's Appx., pp. 520-523 - Strong at 47:5-50:2.

73.     "[T]he lack of a documented process cast[s] doubt upon the prudence of how the Large Cap Stock Fund was constructed." Movant's Appx., p. 53 - Levy Report, ¶71.

74.     The lack of a documented process casts doubt "upon the existence, scope and application of prudent criteria used to select separate account managers and to justify the use of active management strategies." *Id.*

75.     CenturyLink failed to engage in any oversight of CIM. Movant's Appx., p. 374 - Lutito at 46:3-19.

76.    CenturyLink informed CIM that it favored more active management in the Plan, and CIM created the Large Cap Fund with that in mind. Movant's Appx., pp. 533-537 - Strong at 76:10-80:13.

77.    The strategy for the Active Multi-Manager Funds for the plan which had been largely summarized in the Strategy Summary Memorandum of March 30, 2012 (Exhibit 8), had been influenced by CenturyLink senior management who had "expressed a greater appetite for active management." Movant's Appx., pp. 49-50 - Levy Report, ¶66.

78.    "Having allocated investment management responsibility for the Plan to CIM as Named Fiduciary, thus giving CIM unfettered discretion in managing the Plan's investments, CenturyLink's exercise of such influence was contrary to best practice and imprudent." *Id.* (citing Movant's Appx., p. 671 - CL 00001366 at CL 00001435, Movant's Appx., p. 360 - Exhibit 6 (Review of Proposed Employee Benefit Plan Governance Structure, October 25, 2011) at CL 00014850).

79.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by failing to adopt and apply an investment policy statement (IPS) for the Plan." Movant's Appx., p. 28 - Levy Report, ¶10a.

80.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by failing to cause CIM to adopt and apply written policies and procedures governing the management of the Plan's investments." *Id.* - Levy Report, ¶10b.

81.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by failing to establish prudent documented investment selection criteria, as would be found in an IPS, to be applied on a consistent basis to the selection of the Plan's investments, including

the Large Cap Stock Fund, the Target Date Funds and investment managers, particularly Cornerstone Investment Partners." *Id.* - Levy Report, ¶10c.

82.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by permitting the bias of senior CenturyLink management towards active management to influence their investment decisions." *Id.* - Levy Report, ¶10d.

83.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by adopting active investment management strategies without evaluating and justifying the additional cost of such strategies in relation to the cost of passive investment strategies." *Id.* - Levy Report, ¶10e.

84.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by failing to establish prudent written investment monitoring criteria to be applied on a consistent basis to the monitoring of the Plan's investments, including the Large Cap Stock Fund, the Target Date Funds, and investment managers, particularly Cornerstone Investment Partners." *Id.* - Levy Report, ¶10f.

85.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by failing to consistently apply a prudent monitoring process to the Plan's investments, including the Large Cap Stock Fund, the Target Date Funds, and investment managers, particularly Cornerstone Investment Partners." *Id.* - Levy Report, ¶10g.

86.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by failing to evaluate and consider alternative strategies and managers when the Large Cap Stock

Fund experienced consistent underperformance relative to applicable benchmarks, particularly the Large Cap Stock Fund." Movant's Appx., pp. 28-29 - Levy Report, ¶10h.

87.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by failing to cause the CIM investment committee to maintain minutes of its meetings or otherwise document its deliberations and its reasons for fiduciary decisions." Movant's Appx., p. 29 - Levy Report, ¶10i.

88.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by failing to adopt and consistently apply policies and procedures to address funds or strategies that did not meet benchmark expectations or exhibited other shortfalls in relation to selection criteria." *Id.*- Levy Report, ¶10j.

89.    "The Plan fiduciaries did not act in a manner consistent with fiduciary prudent practice and the best interest of participants and beneficiaries by failing to apply prudent monitoring and oversight of the investment activities on behalf of the Plan of CIM's Investment Committee and of CIM." *Id.* - Levy Report, ¶10k.

90.    Because CIM lacked functional investment management and supervisory processes, they failed to assess how much risk and deviation from the index was necessary to have a reasonable chance of achieving its stated objective. Movant's Appx., p. 239 - Duval Report, ¶179.

## **STANDARD OF REVIEW**

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P 56(a). A dispute is "genuine" if the issue could be resolved in favor of either party. *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Alder v. Wal-Mart Stores, Inc.* 144 F.3d 664, 670 (10th Cir. 1998). A fact is "material" if it might reasonably affect the outcome of the case. *See Id.*

The moving party bears the initial burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alder*, 144 F.3d at 670. "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ERISA'S FIDUCIARY STANDARDS

Under ERISA, plan participants, beneficiaries, and fiduciaries may "bring actions on behalf of a plan to recover for violations of the obligations defined in [29 U.S.C. § 1109]." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 253 (2008) (citing 29 U.S.C. § 1132(a)(2)). ERISA "'imposes a "prudent person" standard by which to measure fiduciaries' investment decisions and disposition of assets.'" *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (citations omitted). Pursuant to ERISA, fiduciaries must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B). A fiduciary is expected to "discharge his duties

with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." *See* 29 U.S.C. §1104(a)(1)(A)(i).

CIM acknowledged that it was held to the "Prudent Man Rule" meaning that in creating, offering, and monitoring the Plan it "must act 'with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the investment of a fund of like character and with like aims.'" ¶33. Under ERISA, the prudent man rule is known as the "prudent expert" rule because the standard is not just one of prudence that would be applied by a conscientious layman, but prudence applied by an expert in the field, acting in the same position, with the same goals. ¶31. The Department of Labor has elaborated on the prudent expert standard, writing: "the courts have evaluated the prudence of a fiduciary's actions under ERISA by "focusing on the process the fiduciary used to reach its determination or recommendation – whether the fiduciary, "at the time they engaged in the challenged transactions, employed the proper procedures to investigate the merits of the investment and to structure the investment." ¶ 32.

In evaluating a fiduciary's compliance with the prudence rule, the "primary question is whether the fiduciaries, 'at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1043 (9th Cir. 2001) (citation omitted); *see also Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009). "A fiduciary must engage in an objective, thorough, and

analytical process that involves consideration of the quality of competing providers and investment products, as appropriate." 72 Fed. Reg. 60453 (October 24, 2007) (Preamble).

A contention that a fiduciary has undergone a robust investigation of an investment does, however, not in and of itself relieve the fiduciary of liability if the circumstances reflect a breach of duty despite the rigorous investigation. *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 33 (1st Cir. 2018); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007); *Ellis v. Fid. Mgmt. Tr. Co.*, 257 F. Supp. 3d 117, 129 (D. Mass. 2017), *aff'd*, 883 F.3d 1 (1st Cir. 2018). Rather, a fiduciary is under a duty to exercise reasonable prudence in selecting investments, and this objective reasonableness standard is applied to the subjective needs of the fund—the "conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); *Jenkins v. Yager*, 444 F.3d 916, 925 (7th Cir. 2006); *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996) ("In addition, the prudence requirement is flexible, such that the adequacy of a fiduciary's independent investigation and ultimate investment selection is evaluated in light of the character and aims of the particular type of plan he serves." (quotations and citation omitted)).

Plaintiffs must show that a proper exercise of procedural prudence—meeting and considering the fund's then-extant investments—would have averted the harm which "necessarily require[s] a plausible allegation explaining how no reasonable fiduciary could conclude that removing such investments would not be likely to do more harm than good to the plan and its participants." *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 114 (S.D.N.Y. 2018), *aff'd sub nom. O'Day v. Chatila*, 774 F. App'x 708 (2d Cir. 2019).

Plaintiffs must allege facts to support the conclusion that CIM would have acted differently had they engaged in proper monitoring—and that an alternative course of action could have prevented the plan's losses. *Kopp v. Klein*, 894 F.3d 214, 221 (5th Cir. 2018).

## ARGUMENT

### I.    Element I: CenturyLink and CIM are Plan Fiduciaries

CIM is a wholly-owned subsidiary of CenturyLink, and operates as in-house investment fiduciary for the various employee benefit and welfare plans sponsored by CenturyLink. Movant's Appx., p.683 - CL 00048603; ¶6.  Beginning in April 2012, CIM began offering a new investment lineup which included a company stock fund and nine core investment options ("Core Funds"), including the Active Large Cap U.S. Stock Fund ("Large Cap Fund"). ¶5. The Target Date Funds each had significant holdings in the Large Cap Fund. ¶11. CIM was well-aware of the Large Cap Fund's negative performance impact on the Target Date Funds. ¶¶41-42.

The Plan is established and maintained by a written plan document as required by 29 U.S.C. §1102(a)(1). The Plan is an "employee pension benefit plan" under 29 U.S.C. §1002(2)(A), and an "individual account plan" or "defined contribution plan" under 29 U.S.C. §1002(34). ¶¶7-8. In 2011, CenturyLink appointed CIM as its Plan Investment Fiduciary, making CIM a Named Fiduciary. ¶23. CenturyLink retained the non-delegable duty to select an appropriate fiduciary to act as an Investment Manager and to monitor the Investment Manager's activities "to ensure its activities are in the best interests of the plan participants" and would retain co-fiduciary responsibility under ERISA. ¶24.

Fiduciaries are also under a continuing duty to conduct a regular review of their investment decisions and remove those investments which, although perhaps initially prudent, have become improper to retain. *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828 (2015). Under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Id.* If an investment is imprudent, the plan fiduciary "'must dispose of it within a reasonable time.'" *Id.* (citation omitted).

CenturyLink was a functional fiduciary, with co-fiduciary duty and a duty to monitor CIM. CenturyLink had the authority to terminate and/or replace the investment managers at CIM, or to terminate and/or replace CIM as the investment manager for the fund. Several key CIM employees share dual positions at both CenturyLink and CIM. ¶¶29-30. However, CenturyLink failed to engage in any oversight of CIM. ¶¶38, 47, 75, 89.

Where a plan sponsor has appointed an investment committee and/or administrative committee or has otherwise allocated fiduciary responsibility to a named fiduciary for managing the plan's investments, the plan sponsor (usually through its board of directors) has a separate duty to monitor those committees or named fiduciary to ensure they are fulfilling their fiduciary responsibilities, including reviewing committee minutes, the IPS, and other records, as well as receiving periodic reports or presentations from the committee or named fiduciary. ¶25.

## II.  Element II: Defendants Breached their Fiduciary Duty to Plaintiffs and the Plan

### A.  Defendants Breached their Duty by Failing to Have any Formal, Written Processes in Place Governing the Administration and Management of the Fund.

The Active Large Cap U.S. Stock Fund Objective and Fund Management was described as follows: "The Active Large Cap U.S. Stock Fund's objective is to exceed the return of a broad market index of the largest 1,000 companies in the U.S. using an actively managed multi-manager approach." The managers of the Fund seek to add returns above the benchmark through actively selecting stocks and favoring investment styles they believe will outperform the benchmark over long periods. ¶12.

Documentation of a 401(k) plan's investment process is a fundamental best practice, yet CIM had virtually no written guidelines or processes governing the administration and management of the Fund. ¶¶27, 34, 45-47, 63. CIM had no written investment policy statement for the 401(k) Plan, and no written policies or procedures governing the strategizing, implementation, or monitoring of the Plan. ¶27. An IPS for a predecessor plan was prepared bearing a date of December 22, 2010, but an IPS in such form or similar was never adopted by the Plan. ¶35. This demonstrates that CIM knew of this best practice but CIM failed to implement it. ¶36.

There are multiple instances of purported processes with absolutely no written or formal process or structure. ¶¶27, 34, 45-47, 63. For instance, CIM's investment committee kept no official minutes of its meetings. ¶39. Further, CIM personnel testified that they focused on investment performance over a business or market cycle, but this measure of performance is not articulated in the Fund's Strategy Summary or in agreements with Fund managers. ¶40. Kathy Lutito, CIM's Chief Investment Officer, testified that CIM had no written investment policy statement and had no other written policies and procedures for the Plan. ¶46.

In fact there are only two documents that even purport to detail the process CIM purportedly used to design the Fund: 1) The April 29, 2011 one-page backtest summary and accompanying charts, (Movant's Appx., p. 573 - CL 00074394-402) and; 2) The March 30, 2012 memo written after the Fund design and introduction as an investment option in the Plan (Movant's Appx., p. 582 - CL 00005102). ¶43.

Defendants' expert Charles Porten concludes that 1) The design and management of the Large Cap Fund and Target Date Funds ("the Funds") were consistent with industry standards, and 2) oversight and monitoring of the Funds were consistent with industry standards. Movant's Appx., pp. 693-694 - Expert Report of Charles Porten, dated October 11, 2019 ("Porten Report"), ¶9. He goes on to describe the "standards of conduct expected of investment fiduciaries" according to three different standards. *Id.*, pp. 694-698 – Porten Report, ¶¶11-15. However, he does not explain in any detail how or why his vague descriptions of Defendants' conduct conforms to these standards, nor how their approach led to "reasonable conclusions," but rather makes conclusory statements that they do without factual support. Further, as described in Plaintiffs' motion to exclude, nearly Porten's entire report and opinions are improperly based upon his review of an attorney-generated document which he did not independently verify.

B. <u>Defendants Breached their Duty to Plaintiffs and the Plan by Failing to Create any Processes or Guidelines to Address the Fund's Underperformance.</u>

CIM did not have any rules for flagging a strategy that wasn't working, nor did they have any formal process or written policies for investment strategies, decision-making, or assessing managers. ¶¶62-63. By failing to undertake meaningful and substantive

strategy fit reviews, CIM acted contrary to industry standards and failed to meet the standard of care of a prudent investment expert. ¶64.

CIM failed to rigorously test the manager lineup they chose to manage the Fund's assets. ¶55. They also lacked functional guidelines for how the Fund's strategy was created or implemented in a way that was expected to meet benchmarks, how many fund managers were chosen, which fund managers were chosen, how managers were monitored, how adjustments were to be made, and how the long-term strategy was expected to work over the course of a "market cycle." ¶48.

The lack of a documented process undermines the prudence of how the Large Cap Stock Fund was constructed, and casts doubt upon the existence, scope and application of prudent criteria used to select separate account managers and to justify the use of active management strategies. ¶¶73-74. Because CIM lacked functional investment management and supervisory processes, they failed to assess how much risk and deviation from the index was necessary to have a reasonable chance of achieving its stated objective. ¶90.

This was a breach of Plaintiffs' fiduciary duties because a prudent investment expert in the field would have had formal processes in place and documentation that could ensure effective and prudent decision making.

C. Defendants Breached their Duty to Plaintiffs and the Plan by Giving Paul Strong Excessive Discretion in Management of the Funds, and CenturyLink and CIM Failed to Oversee His Management.

CIM personnel functionally delegated all authority with respect to the Plan and the Fund to Paul Strong, CIM's Investment Manager. ¶¶70-71.  There were no policies or

procedures in place for other CIM personnel to monitor and evaluate Mr. Strong's or the Fund's performance. ¶¶59-67.

Paul Strong operated with unfettered discretion in creating and managing the Large Cap Fund. Reviews of the Fund strategy (and therefore of Strong) should have been undertaken by someone other than Strong, otherwise it would not be oversight, and this function likely would have fallen to Kathleen Lutito, the CIM Senior Vice President, President, and Chief Investment Officer. ¶¶60-61. However, no such oversight ever took place. ¶¶59-67, 70-71. This is in part because there was no formal or functional process for Lutito overseeing or managing Strong. ¶59.

The other members of CIM's Investment Committee routinely deferred to Mr. Strong's judgment on all matters related to the Fund. The Investment Committee did not do any independent analysis of the driver biases presented by Strong to determine whether they were sound ¶¶70-71.

This constituted a breach of Defendants' fiduciary duties and led to the imprudent design of the Large Cap Fund. It also allowed continued underperformance of the Large Cap Fund after Defendants knew, or should have known, that the Plan design was fatally flawed.

III.   **Element III: Because Defendants Breached these Duties, Plaintiffs Suffered Damages**

CIM lacked a clear and coherent hierarchy regarding decision-making monitoring and oversight and as a result they implemented a flawed design in the Large Cap Fund. ¶¶63, 87. They compounded this by stubbornly refusing to adjust their process, in large part because of a lack of process to guide the review, analysis, and proper adjustments

necessary in monitoring the Fund's performance. If there had been proper processes in place, the Fund would not have suffered from deficient designs that made the Fund virtually certain to underperform. Further, there would have been safeguards in place against the flawed design, which could have allowed for an earlier correction and a mitigation of Plaintiffs' damages.

Plaintiffs' expert Jeffrey E. Nehls analyzed the estimated losses that Plaintiffs suffered due to Defendants' breaches of their fiduciary duties. His report demonstrates that the Fund suffered nearly $47 million in losses compared to if it had simply performed at pace with its benchmark index, the Russell 1000. Movant's Appx., p. 775 - Expert Report of Jeffrey E. Nehls, dated October 11, 2019 ("Nehls Report"), p. 5. The Fund suffered over $77 million in losses compared to if it had performed 1% above the Russell 1000, which was its stated objective. *Id.*, p. 777 – Nehls Report, p. 7. Accordingly, the estimated damages to Plaintiffs and putative class members range from approximately $46,934,500 to $77,242,900 depending on the scenario considered. *Id.*, p. 782 – Nehls Report, p. 12.

## CONCLUSION

As demonstrated above, the Court should grant summary judgment in favor of the Plaintiffs on all causes of action.

Respectfully submitted this 19th day of November 2019.

> *s/ Paul R. Wood*
> Paul R. Wood
> Sean Nation
> FRANKLIN D. AZAR & ASSOCIATES, P.C.
> 14426 E. Evans Ave.

Aurora, CO 80014
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of November 2019, I electronically filed and served the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DEFENDANT CENTURYLINK INVESTMENT MANAGEMENT COMPANY'S BREACH OF FIDUCIARY DUTY FOR FAILURE TO MONITOR** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record:

| Michael S. Beaver | □ | by First-Class U.S. Mail |
| Matt Smith | □ | by e-mail |
| Holland & Hart LLP | □ | by Share File |
| 6380 S. Fiddlers Green Cir., Suite 500 | □ | by Overnight Mail |
| Greenwood Village, CO  80111 | ■ | by CM/ECF system |
| 303-295-1637 (Office) | | |
| mbeaver@hollandhart.com | | |
| mjsmith@hollandhart.com | | |

| Craig C. Martin | □ | by First-Class U.S. Mail |
| Amanda Amert | □ | by e-mail |
| Cristina Covarrubias | □ | by Share File |
| Jenner & Block LLP | □ | by Overnight Mail |
| 353 North Clark Street, Chicago | ■ | by CM/ECF system |
| IL 60654-3456 | | |
| CMartin@jenner.com | | |
| AAmert@jenner.com | | |
| CCovarrubias@jenner.com | | |

s/ *Stephanie Chateauneuf*
Stephanie Chateauneuf