IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-2872-CMA-NYW

BONNIE BIRSE and GERAD DETWILER, individually and on behalf of all similarly
situated participants and beneficiaries of the CenturyLink Dollars & Sense 401(k) Plan,

     Plaintiffs,

v.

CENTURYLINK, INC., and CENTURYLINK INVESTMENT MANAGEMENT COMPANY,

     Defendants.

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, defendants CenturyLink, Inc., ("CenturyLink") and CenturyLink Investment Management Company ("CIM") move for summary judgment on all claims in plaintiffs' third amended complaint.  Defendants are entitled to judgment as a matter of law because plaintiffs cannot demonstrate a genuine material factual dispute as to a single claim in their complaint or as to defendants' affirmative defenses.

## STATEMENT OF MATERIAL FACTS

CenturyLink is a publicly-traded telecommunications company.  (Dkt. 94, ¶ 24.)  It offers the CenturyLink Dollars & Sense 401(k) Plan (the "Plan") to its employees as a retirement planning option.  (Movants' App'x, p. 255 – 2012 SPD.)  The Plan is a safe harbor plan that complies with the safe harbor provision of ERISA § 404(c).  (*Id.*, pp. 9–14 – Gorrell Decl. ¶¶ 28–47.)  Plan participants choose how much to contribute and how

to allocate their accounts, and can redirect their investments at any time.  (*Id.*, pp. 9, 13 – Gorrell Decl., ¶¶ 28, 42.)

CenturyLink is the Plan sponsor (Dkt. 94, ¶ 24), and does not make investment decisions relating to the Plan.  (Movants' App'x, p. 1318 – Lutito Decl. ¶ 14.)  CIM serves as the Plan's investment fiduciary.  (Dkt. 94, ¶ 25; Movants' App'x, p. 9 – Gorrell Decl. ¶ 29.)  As the investment fiduciary, CIM makes all investment decisions, including determining general investment strategies for Plan assets, selecting outside investment managers, and monitoring the performance of the Plan.  (*Id.*, p. 1316 – Lutito Decl. ¶ 7; *id.*, p. 226–27 – Apr. 1, 2012 Plan; *id.*, p. 1804 – 2012 Annual Report.)

At issue in plaintiffs' complaint are two investment options designed and managed by CIM for the Plan: the Active Large Cap U.S. Stock Fund (the "Large Cap Fund" or "Fund") and the Plan's set of target date funds, which included the Fund as a component.[1] (*See generally* Dkt. 94.)  In their first claim, plaintiffs allege that CIM breached its fiduciary duty by imprudently offering the allegedly underperforming Fund and then failing to replace it.  (*Id.* ¶¶ 104–108.)  In their second claim, plaintiffs allege that CenturyLink breached a duty to monitor CIM with respect to the Fund.  (*Id.* ¶¶ 109–14.)  In their third claim, plaintiffs contend that CenturyLink is liable as a co-fiduciary for CIM's alleged breach.  (*Id.* ¶¶ 115–18.)

CIM designed the Large Cap Fund, as well as the target date funds, in 2011 and 2012 following a corporate merger among CenturyLink, Embarq Corporation, and Qwest

---

[1] Target date funds, which are the default investment fund for Plan participants, are diversified, all-in-one investment solutions that become more conservative as the participant nears retirement age.  (Movants' App'x, pp. 10–11 – Gorrell Decl., ¶¶ 33–34.)

Communications International, Inc. ("Qwest"), which resulted in the merging of legacy retirement plans to form the Plan.  (Movants' App'x, p. 1320 – Lutito Decl. ¶ 22.)  CIM's Investment Committee,[2] which is responsible for investment strategies, designed the Plan's new investment structure to include target date funds, core funds, and a self-directed brokerage window.  (*Id.*, p. 493 – Strong Decl., ¶¶ 7–8.)  When designing this line-up, CIM sought to create a reasonable set of options for participants, while maintaining familiar aspects of the legacy plans.  (*Id.*, p. 493 – Strong Decl. ¶ 7.)  The Plan thus offers both passively-managed funds (the legacy Qwest plan had largely passive options) and actively-managed funds (the legacy CenturyLink and Embarq plans had many active choices).  Thus, CIM offered the Large Cap Fund as an active strategy to complement the passive U.S. Stock Index Fund.  (*See id.*, p. 1320 – Lutito Decl. ¶ 23; *id.*, p. 493 – Strong Decl. ¶ 7.)

With the Large Cap Fund, CIM sought to obtain excess returns over the Russell 1000 Stock Index ("Russell 1000"), with increased downside and wealth protection, at a reasonable price over the long term.  (Movants' App'x, p. 493 – Strong Decl. ¶ 9; *id.*, p. 3 – Gorrell Decl. ¶ 8.)  CIM conducted extensive quantitative and qualitative research and analysis to create the Fund's design.  (*See id.*, pp. 493, 495 – Strong Decl. ¶¶ 8, 14; *id.*, pp. 1320–21 – Lutito Decl. ¶¶ 24–26.)  This research included speaking with external portfolio managers and modeling the performance of the Large Cap Fund in hypothetical

---

[2] CIM, including its Investment Committee, is staffed by investment professionals with advanced degrees in business, finance, or economics, and years of experience in the investment industry.  (Movants' App'x, pp. 1318–19 – Lutito Decl., ¶¶ 15–16)  Many also hold the Chartered Financial Analyst ("CFA") designation, which is the highest distinction in the investment management profession.  (*Id.*)

past markets.  (*See id.*, pp. 495–96 – Strong Decl. ¶¶ 16–17; *id.*, p. 2190 – Matson Decl. ¶ 9.)

CIM ultimately structured the Large Cap Fund as an active multi-manager fund, with a mid-cap and a slight value bias.  (Movants' App'x, p. 494 – Strong Decl. ¶ 10.)  CIM used the multi-manager strategy to provide participants with full beta exposure to asset classes, maintain sufficient liquidity to allow for efficient rebalancing, and provide excess returns above the passive benchmark, while protecting against downside risk through diversification.  (*Id.*, p. 494 – Strong Decl. ¶ 12.)  The mid-cap and value biases were designed to provide additional potential sources of active return.  (Movants' App'x, pp. 494–95 – Strong Decl. ¶¶ 13, 15; *id.,* p. 551 – Mar. 2012 Memorandum ("Dep. Ex. 8").)

CIM engaged in a process to evaluate and select particular managers for the Large Cap Fund, both when it launched the Fund and later when CIM evaluated potential new managers over the life of the Fund.  (*See* Movants' App'x, pp. 497–98 – Strong Decl. ¶¶ 21, 24.)  It researched prospective managers' reputation, performance, risk and return profile, and style (*see id.*, pp. 497–98 – Strong Decl. ¶ 22; *id.*, p. 2190 – Matson Decl. ¶ 8; *id.*, p. 488 – Litchfield Decl. ¶¶ 7–8), and conducted introductory calls and on-site visits to understand the prospective managers' investment processes (*id.*, pp. 497–98 – Strong Decl. ¶¶ 22, 24; *id.*, p. 2190 – Matson Decl. ¶ 8; *id.*, p. 488 – Litchfield Decl. ¶ 7).  To minimize risk, CIM sought managers who demonstrated an ability to protect wealth in difficult markets and whose returns were not correlated with other Fund managers.  (*Id.*, p. 497 – Strong Decl. ¶ 21.)

CIM considered many managers with whom a legacy plan had a pre-existing

relationship.   (Movants' App'x, p. 498 – Strong Decl. ¶ 23.)   CIM conducted re-underwriting on the pre-existing managers, and the Investment Committee reviewed them and made the decision whether to use them for the Large Cap Fund.  (*Id.*, p. 549 – Dep. Ex. 8.)  CIM also considered, and ultimately selected, some managers with whom it did not have pre-existing relationships.  (*Id.*, p. 498 – Strong Decl. ¶ 23; *id.*, pp. 549–50 – Dep. Ex. 8.)  CIM's Investment Committee considered and discussed formal written proposals for hiring new managers, and each Investment Committee member signed the proposal to indicate his or her agreement.  (*Id.*, p. 1322 – Lutito Decl. ¶ 27; *id.*, p. 499 – Strong Decl. ¶ 25; *id.*, pp. 2190–91 – Matson Decl. ¶¶ 11–12, 14–15; *id.*, p. 488 – Litchfield Decl. ¶¶ 10–11.)  CIM memorialized this manager selection process in a March 30, 2012 memorandum (*id.*, pp. 549–50 – Dep. Ex. 8), and the Investment Committee understood and agreed to the structure (*id.*, pp. 1321–22 – Lutito Decl. ¶ 26).

After launching the Large Cap Fund, CIM engaged in comprehensive, ongoing monitoring of the performance of the Fund and its managers, consistent with industry standards.  (Movants' App'x, p. 2409 – Porten Rep. ¶ 42; *see also id.*, pp. 1322–23 – Lutito Decl. ¶¶ 28–29.)  CIM used long-term outperformance of the passive benchmark on a rolling three-year basis as one quantitative measure of the success of the Large Cap Fund's strategy.  (*Id.*, p. 500 – Strong Decl. ¶ 29.)  CIM held meetings on a weekly, bi-monthly, and monthly basis to discuss aspects of Plan investments, including the performance of the Large Cap Fund and its managers.  (*Id.*, p. 500 – Strong Decl. ¶ 28; *id.*, pp. 1323–24 – Lutito Decl. ¶¶ 31, 35.)  CIM personnel received monthly performance reports that detailed the performance of the Fund, as well as that of the target date funds.

(*See, e.g. id.*, p. 500 – Strong Decl. ¶ 28; *see also id.*, pp. 5–6 – Gorrell Decl. ¶¶ 18–19). With respect to the target date funds, CIM rebalanced the funds on a monthly basis, as needed, to maintain the overall risk level for each fund.  (*Id.*, p. 6 – Gorrell Decl. ¶ 20.)

In addition to the weekly and monthly meetings, CIM's Investment Committee held quarterly meetings to discuss investment risks.  (*See* Movants' App'x, p. 1323 – Lutito Decl. ¶ 31; *id.*, p. 489 – Litchfield Decl. ¶ 15.)  It also received quarterly performance reports on Plan funds, including the Large Cap Fund (*see, e.g., id.*, p. 1323 – Lutito Decl., ¶ 31) and the target date funds (*id.*, p. 6 – Gorrell Decl., ¶ 21).  CIM's Investment Committee met quarterly to review and discuss those reports.  (*Id.*, p. 6 – Gorrell Decl., ¶ 21;  *id.*, p. 1323 – Lutito Decl. ¶ 31; *id.*, p. 499 – Strong Decl., ¶ 26; *id.*, p. 2191–92 – Matson Decl. ¶ 18; *id.*, p. 489 – Litchfield Decl. ¶ 15.)  It also conducted annual deep dive performance reviews of each strategy, including the Fund.  (*See id.*, p. 1323 – Lutito Decl. ¶ 32; *id.*, p. 499 – Strong Decl. ¶ 26; *id.*, p. 2192 – Matson Decl. ¶ 19; *id.*, p. 489 – Litchfield Decl. ¶ 16.)   CIM likewise reviewed the target date funds annually and developed a revised set of targets based on a glide path concept informed by academic research and simulation models.[3]  (*Id.*, pp. 4–5, 7 – Gorrell Decl. ¶¶ 13–16, 23.)

Additionally, CIM personnel regularly interacted with the Plan's investment managers, including those for the Large Cap Fund, on a less formal basis.  (Movants'

---

[3] A glide path refers to how the mix of stocks, complimentary assets and bonds in an investment vehicle decreases in risk as the vehicle approaches its target date (or retirement year).  (Movants' App'x, p. 4 – Gorrell Decl. ¶ 14.)  Beginning in 2014, CIM worked with Morningstar Investment Management ("Morningstar") to derive the glide paths for each target date fund on an annual basis based on participant factors such as account values, salary levels and contribution rates.  (*Id.*, p. 4 – Gorrell Decl. ¶ 13.)

App'x, p. 1324 – Lutito Decl. ¶ 33; *id.*, p. 501 – Strong Decl. ¶ 30; *id.*, p. 2192 – Matson Decl. ¶ 21; *id.*, p. 490 – Litchfield Decl. ¶ 18.)  They had regular calls, emails, and in-person meetings with each investment manager.  (*Id.*, p. 1324 – Lutito Decl. ¶ 33; *id.*, p. 501 – Strong Decl. ¶ 30;  *id.*, p. 2192 – Matson Decl. ¶ 21; *id.*, p. 490 – Litchfield Decl. ¶ 18.)

Over the course of its existence, the Large Cap Fund had excellent returns.  (*See* Movants' App'x, p. 2358 – Montgomery Rep. ¶ 15; *see also id.*, p. 2255 – Levy Dep. Tr. 166:2–6; *id.*, pp. 2244–47 – Nehls Dep. Tr. 123:10–126:13.)  Participants who invested in the Fund throughout its five-plus year life received an 83% cumulative return over five and a half years.[4]  (*Id.*, p. 2358 – Montgomery Rep. ¶ 15.)  However, the Large Cap Fund underperformed compared to its benchmark during certain periods.  (*See id.*, p. 501–502 – Strong Decl. ¶ 31.)  CIM analyzed this underperformance, and determined it could be attributed to market factors.  (*Id.*; *see also id.*, pp. 2365–68 – Montgomery Rep. ¶¶ 38–43.)  CIM evaluated whether changes to the investment strategy were necessary and concluded that they were not, because, an efficient market would recognize the value of the Large Cap Fund's underlying holdings in the long term.  (*See id.*, pp. 496, 501–502 – Strong Decl. ¶¶ 19, 31.)   It therefore continued to offer the Fund to achieve outperformance over a market cycle (*id.*, p. 19 – Strong Decl. ¶ 19), which refers to an

---

[4] Between 2012 and 2017, the target date funds also had absolute positive returns, and, on the whole, the funds consistently outperformed their benchmark.  (Movants' App'x, p. 8 – Gorrell Decl. ¶ 25; *id.*, pp. 2311–12 – Dec. 2017 401(k) Fund Performance; *see also id.*, pp. 2359, 2371 – Montgomery Rep. ¶¶ 20, 52.)

economic cycle with ups and downs that may last anywhere from three years to ten years or more (*id.*, p. 2189 – Matson Decl. ¶ 7).

Although its basic strategy remained consistent, CIM made changes to the Large Cap Fund's composition at several points.  (Movants' App'x, p. 502 – Strong Decl. ¶ 32.) For example, CIM replaced two Fund managers in November 2012 when it obtained more capacity with T. Rowe Price, a top performer.  (*See id.*, p. 502 – Strong Decl. ¶ 32 & n.1.) CIM terminated a third manager in December 2016.  (*Id.*, pp. 1324–25 – Lutito Decl. ¶ 37; *see also id.*, p. 502 – Strong Decl. ¶ 32 n.1.)  CIM also changed the asset allocations to certain Fund managers at various points for various reasons.  (*Id.*, pp. 502–503 – Strong Decl. ¶ 33.)

In September 2017, CIM merged the Large Cap Fund with another actively-managed core fund, the Active Small Cap U.S. Stock Fund, to create the Active U.S. Stock Fund.  (Movants' App'x, p. 503 – Strong Decl. ¶ 34.)  In doing so, CIM sought to simplify the participant experience, create broad market symmetry between active and passive equity offerings, and eliminate the highest fee core fund offering.  (*Id.*; *see also id.*, p. 1325 – Lutito Decl. ¶ 40.)

Since 2012, plaintiff and Plan participant Bonnie Birse, has allocated her Plan account entirely to the 2015 Target Date Fund.  (Dkt. 131-8, ¶¶ 2, 6.)  Plaintiff Gerad Detwiler was a Plan participant from 2015 to July 1, 2017, and, for most of that time, a portion of his account was allocated directly to the Large Cap Fund.  (Dkt. 131-9, ¶ 2; Movants' App'x, p. 2453 – July–Sept. 2017 Detwiler Account Statement.)

## PROCEDURAL HISTORY

Plaintiffs filed their operative third amended complaint on March 20, 2019.  (Dkt. 94.)  Defendants moved to dismiss it on April 3, 2019.  (Dkt. 97.)  The parties briefed class certification (Dkt. 131, Dkt. 138, Dkt. 143), and completed fact discovery on September 20, 2019.  The parties also engaged in expert discovery.[5]  On October 23, 2019, Magistrate Judge Wang recommended that defendants' motion to dismiss the third amended complaint be granted in part and denied in part.  (Dkt. 146.)

## ARGUMENT

Under Federal Rule of Civil Procedure 56(c), a court may grant summary judgment where there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or is so one-sided that one party must prevail as a matter of law." *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Trust v. Alerus Fin.* ("*Pioneer I*"), No. 12-cv-02547-RM-MEH, 2015 WL 2065923, at *4 (D. Colo. May 1, 2015).  If "the moving party does not bear the burden of persuasion at trial, it . . . may make its prima facie demonstration by pointing out to the court a lack of evidence on an essential element of

---

[5] Plaintiffs designated John J. Duval, Jr., Roger L. Levy, and Jeffrey Nehls as expert witnesses.  Defendants designated John Montgomery, Ph.D., as an expert to provide opinions based on economic research and analysis related to defendants' actions concerning the Large Cap Fund and the target date funds.  Defendants also retained Charles Porten as an expert on the processes used by defendants to design and manage the Fund and the target date funds, and to opine as to compliance with industry standards.

the nonmovant's claim." *Libertarian Party of N.M. v. Herrera,* 506 F.3d 1303, 1309 (10th Cir. 2007) (citation omitted); *see also Trs. of Colo. Laborers' Health & Welfare Tr. Fund v. Am. Benefit Plan Adm'rs, Inc.*, No. 04-cv-2630-FWN-MEH, 2006 WL 2632308, at *3 (D. Colo. Sept. 13, 2006).

The burden then shifts to the non-moving party, who must "set forth specific facts from which a rational trier of fact could find for" it. *Herrera*, 506 F.3d at 1309 (quotation marks omitted); *Pioneer I*, 2015 WL 2065923, at *4. "The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate specific facts showing that there is a genuine issue for trial." *Am. Benefit Plan*, 2006 WL 2632308, at *3 (quoting *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

After substantial discovery, there is no genuine dispute as to any material fact regarding whether CIM properly designed and monitored the Large Cap Fund or whether CenturyLink is liable as a co-fiduciary or for failing to monitor CIM. All of the evidence demonstrates that CIM undertook a rigorous and thorough process in creating and maintaining the Large Cap Fund as a Plan investment option and in monitoring the performance of the Fund and its investment managers thereafter. Based on that robust fiduciary process, CIM made reasoned decisions as to the Fund. The Court should therefore grant defendants judgment as a matter of law.

## I.     Plaintiffs Cannot Prove That CIM Breached Its Fiduciary Duties.

In their first claim, plaintiffs allege that CIM improperly designed the Large Cap

Fund, including in its selection of managers for the Fund.  (Dkt. 94, ¶ 54.)  Plaintiffs further

take issue with CIM's monitoring of the Fund, alleging that CIM ignored the Fund's alleged

underperformance and maintained a "flawed" investment strategy instead of replacing

the Fund.  (*Id.* ¶¶ 84, 94.)  According to plaintiffs, CIM improperly included the Large Cap

Fund as an investment in the target date funds.  (*Id.* ¶ 89.)  Plaintiffs contend that this

conduct amounts to a breach of the fiduciary duty of prudence.

ERISA requires plan fiduciaries to act with "the care, skill, prudence, and diligence

under the circumstances then prevailing that a prudent man acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character

and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This duty of care requires prudence, not

prescience, and courts judge a fiduciary's actions "based upon information available to

the fiduciary at the time of each investment decision and not from the vantage point of

hindsight."  *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan*

*v. Morgan Stanley Inv. Mgmt. Inc.* ("*St.Vincent*"), 712 F.3d 705, 716 (2d Cir. 2013).  A

decision reached as a result of rational consideration is not a fiduciary breach, even if its

outcome is undesirable.  *Ellis v. Fid. Mgmt. Trust Co.*, 883 F.3d 1, 11 (1st Cir. 2018)

(affirming summary judgment for defendant on duty of prudence claim).  That is because

the "test of prudence . . . is . . . not a test of the result of the performance of the

investment."  (Dkt. 93 at 7 (quoting *Ellis*, 883 F.3d at 10).)

To prevail on a prudence claim, a plaintiff must establish that a plan fiduciary

breached its fiduciary duties, and the breach resulted in a loss to the plan.  29 U.S.C.

§ 1109; *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Trust v. Alerus Fin.*

("*Pioneer II*"), 858 F.3d 1324, 1333–34, 1337 (10th Cir. 2017).  Thus, as applied here, plaintiffs must prove that: (1) CIM acted imprudently in designing and monitoring the Large Cap Fund, and (2) that imprudence caused a loss to the Plan.  As to the second element, the court asks whether a hypothetical prudent fiduciary would have made the same decision anyway.  *Tatum v. RJR Pension Inv. Comm.*, 855 F.3d 553, 558 (4th Cir. 2017); *see also Pioneer II*, 858 F.3d at 1336–37.  Plaintiffs cannot meet their burden as to either element.

### A.   All Undisputed Facts Demonstrate That CIM Followed A Prudent Process In Designing And Monitoring The Large Cap Fund.

At the core of plaintiffs' first claim is their complaint that the Large Cap Fund underperformed its benchmark index, the Russell 1000.  But underperformance is not a fiduciary breach, and discovery has revealed that CIM employed a prudent process in designing and monitoring the Large Cap Fund.  In fact, the undisputed facts demonstrate that CIM engaged in appropriate methods to investigate and determine the merits of the Fund during its creation, including the Fund's inclusion in the target date funds, and in retaining the Fund as an investment option thereafter.  *See Ellis*, 883 F.3d at 11 (affirming summary judgment finding that defendant engaged in an evaluative process prior to making investment decisions).

### 1.   All Evidence Shows CIM Used A Prudent Fund Design Process.

CIM undertook extensive, appropriate research into how to structure the Fund, including with respect to an appropriate strategy and the selection of managers.  (*See* Movants' App'x, pp. 506–44, – Sept. 2011 Presentation ("Dep. Ex. 3") (providing overview of new investment options under the Plan, including the Large Cap Fund and its objective,

estimated size, and structure).)   With regard to strategy, CIM carefully considered the role of the Large Cap Fund in the suite of investment options offered as part of the overall Plan portfolio.  (*See id.*, p. 493 – Strong Decl. ¶¶ 7–8; *see also id.*, pp. 2400–402 – Porten Rep. ¶ 38.)   CIM conceived of the Large Cap Fund as an active strategy that could complement the Plan's passive offerings.[6]  (*See id.*, p. 493 – Strong Decl. ¶ 7; *id.*, p. 2204 – Gorrell Dep. Tr. 67:4–17.)   This approach was appropriate, given the empirical evidence that active management can beat passive investing in the long-run.[7]  (*Id.*, pp. 2387–88 – Porten Rep. ¶ 17; *see also id.*, pp. 577–80 – May 2015 Presentation.)   Even Mr. Levy, plaintiffs' process expert, admitted that, "mutual funds which are actively managed offer sufficient intrinsic diversification . . . [and] satisfy an employer's obligation regarding investment diversification."[8]  (*Id.*, pp. 2251–52 – Levy Dep. Tr. 100:2–101:19.)

CIM selected a multi-manager strategy in order to reduce overall risks in the Fund. Having multiple managers reduces risks without changing expected return because the results for each manager will not be perfectly correlated.  (Movants' App'x, pp. 2360–61

[6] Actively-managed funds are a common investment offering.  (*See* Movants' App'xs, p. 2353 – Montgomery Rep. ¶ 6(b).)  As of 2012, dollars invested in active U.S. equity mutual funds exceeded dollars invested in passive U.S. equity mutual funds and exchange-traded funds.  (*See id.*)

[7] Measuring excess returns and active risk over the long-term was consistent with the long-term investment horizon of Plan participants (Movants' App'x, p. 549 – Dep. Ex. 8) and with industry standards (*id.*, p. 2379 – Montgomery Rebuttal ¶ 32; *id.*, pp. 2390–91 – Porten Rep. ¶ 25; *see also id.*, p. 2254 – Levy Dep. Tr. 103:12–24 (one of plaintiffs' expert witnesses acknowledged that investing in actively-managed funds is intended to be a long-term strategy to allow sufficient time for manager strategies to work)).

[8] Mr. Levy also acknowledged that the purpose of diversification "is to spread the risk and opportunity for return among a mix of investments so that on average you achieve a higher return than if you simply invested in a single investment within the portfolio." (Movants' App'x, p. 2253 – Levy Dep. Tr. 102:2–16.)

– Montgomery Rep. ¶¶ 27–28; *see also id.*, pp. 2388–89 – Porten Rep. ¶ 19 (similar).) CIM researched how to construct such a fund and evaluated various possible fund structures in hypothetical past markets. (*See, e.g.*, *id.*, pp. 495–96 – Strong Decl. ¶¶ 14–18.)

As to the selection of managers, CIM engaged in a thorough due diligence process to evaluate and hire appropriate managers for the Large Cap Fund. (*See* Movants' App'x, pp. 549–50 – Dep. Ex. 8.) At the time it launched the Large Cap Fund in April 2012, CIM selected as managers Fiduciary Management ("Fiduciary"), Neuberger Berman, William Blair & Company ("William Blair"), Systematic Financial Management ("Systematic"), and State Street Global Advisors ("SSGA"). (*See id.*, p. 552 – Dep Ex. 8.) CIM selected these managers after concluding that their investment strategies and styles were aligned with the objectives of the Large Cap Fund. (*See id.*, pp. 497, 499 – Strong Decl. ¶¶ 21, 25.)

Fiduciary's large cap value strategy had generally outperformed and had less volatility than the Russell 1000 Value index across multiple periods. (Movants' App'x, p. 2316–18 – Fiduciary Recommendation.) Neuberger Bergman, an experienced investment manager with an attractive track record, had a large cap growth strategy, which consistently outperformed the Russell 1000 Growth index over rolling five-year periods in the ten years immediately preceding the launch of the Fund. (*Id.*, p. 2327 – Neuberger Bergman Portfolio Review.) Similarly, William Blair's mid-cap growth strategy had outperformed the Russell Midcap Growth index since inception for the period ending in December 2011. (*Id.*, pp. 2411–12 – Porten Rep. ¶ 49.) Systematic's mid-cap value strategy had also generally outperformed its benchmark, the Russell Midcap Value index,

over the long-run.  (*Id.*, p. 2322 – Systematic Portfolio Review.)  With respect to State Street Global Advisors, CIM invested in its Russell 1000 passive index strategy to "provide liquidity, facilitate periodic participant cash flows, and to compensate for any managers with capacity constraints." (*Id.*, p. 548 – Dep Ex. 8.)

With the managers' blend of styles, CIM sought to reduce the likelihood that managers would be highly correlated with one another and thus underperform at the same time.  (Movants' App'x, pp. 2211–13 – Strong Dep. Tr. 82:19–84:16; *id.*, p. 2413 – Porten Rep. ¶ 56; *id.*, p. 2362 – Montgomery Rep. ¶ 31.)  The weightings toward mid-cap and value stocks were intended to generate additional sources of active return.  (*Id.*, p. 551 – Dep. Ex. 8.)  As Dr. Montgomery opined, choosing value and mid-cap biases was consistent with the historical performance of those stocks, and with published studies in financial economics.[9]  (*Id.*, pp. 2362–65 – Montgomery Rep. ¶¶ 32–37.)

CIM explained in its March 2012 memorandum—before the launch of the Large Cap Fund— that the Fund and the Plan's other active offerings were designed "to include a set of institutional-grade mangers whose strategies, styles, and return drivers are uncorrelated enough to generate excess returns over the long term at a reasonable level of risk while still providing a measure of increased wealth protection in varying market environment and economic conditions."  (*Id.*, p. 548 – Dep. Ex. 8.)  Ultimately, the managers CIM selected were "among the most experienced and reputable in the industry." (*Id.*, p. 2413 – Porten Rep. ¶ 56.)  CIM's careful and systematic approach to

---

[9] From 1990 through March 2012, value stocks had outperformed growth stocks, and mid-cap stocks had outperformed large cap stocks.  (Movants' App'x, p. 561–63 – Dep. Ex. 8; *id.*, pp. 2362–65 – Montgomery Rep. ¶¶ 32–37; *id.*, pp. 2392–93 – Porten Rep. ¶ 30.)

selecting these managers, along with the other steps it took to design the Fund, hardly evidences the process of an imprudent fiduciary.

### 2. All Evidence Shows CIM Used A Prudent Monitoring Process For The Fund.

The undisputed evidence demonstrates that CIM employed a robust process to monitor the Large Cap Fund by engaging in continual evaluations of the Fund and its managers. (*See* Movants' App'x, p. 1322–24 – Lutito Decl. ¶¶ 28–29, 35; *id.*, pp. 2207–208, 2214–15 – Strong Dep. Tr. 35:13–36:4, 106:16–107:4.)  This process included weekly, monthly, and quarterly meetings discussing performance.  (*Id.*, p. 1323–24 – Lutito Decl. ¶¶ 31, 35; *see also id.* pp. 499–500 – Strong Decl. ¶¶ 26, 28.)  CIM's review also included preparing and circulating monthly performance reports (*id.*, pp. 2201–203 – Gorrell Dep. Tr. 46:10–48:6; *see e.g.*, *id.*, pp. 2296–306 – Aug. 2016 Email from S. Maxwell & Attachment), as well as quarterly performance reports reviewed by the Investment Committee (*see, e.g.*, *id.*, pp. 2159–65 – Oct. 2013 Presentation ("Dep. Ex. 48")) and the CIM Board (*see, e.g.*, *id.*, pp. 28–62 – Aug. 2013 CIM Board Meeting Packet ("Dep. Ex. 1")).  On an annual basis, the Investment Committee conducted thorough reviews of each strategy, during which it analyzed fund and manager performance, among other things.  (*See id.*, p. 1323 – Lutito Decl. ¶ 32.)  The team also had ongoing communications with the Fund's managers as part of its monitoring process.  (*See id.*, p. 1324 – Lutito Decl. ¶¶ 33, 35; *id.*, p. 501 – Strong Decl. ¶ 30.)

In the course of this continuous monitoring of the Large Cap Fund, CIM implemented changes, including modifications to the manager line-up.  Several months after the launch of the Fund, CIM hired Cornerstone Investment Partners ("Cornerstone")

and Waddell & Reed Investment Management Company ("Waddell & Reed," now known as Ivy Investment Management Company) as additional investment managers. (Movants' App'x, pp. 2282–83 – July 2012 Presentation; *id.*, p. 2336 – July 2, 2012 Risk Models.)  Cornerstone's "Concentrated 30" strategy invested in thirty large cap stocks and had "consistently outperformed the Russell 1000 Index across multiple periods, providing excess return at similar volatility to the index."  (*Id.*, p. 722 – June 2012 Memorandum ("Dep. Ex. 2").)  Waddell & Reed had a "Core Equity" strategy, which invested in both value and growth stocks, and over most time periods, the strategy had outperformed the Russell 1000 index.  (*Id.*, p. 2330 – Waddell & Reed Presentation.)

Later, in November 2012, CIM removed Neuberger Berman as a Fund manager. (Movants' App'x, pp. 2286–87 – Oct. 2012 Presentation ("Dep. Ex. 10"); *id.*, pp. 2216–17 – Strong Dep. Tr. 111:14–112:11.)  As Mr. Strong testified, Neuberger Berman's team underwent significant management changes, and after communicating with the portfolio manager, CIM determined it was no longer comfortable retaining Neuberger Berman with the changed dynamics.  (*Id.*, pp. 2216–17 – Strong Dep. Tr. 111:14–112:11.)  CIM also removed William Blair as a manager in the fourth quarter of 2012, in part, because its strategy was closed to new investment.  (*Id.*, pp. 2217–18 – Strong Dep. Tr. 112:12–113:1.)  In the process of re-allocating both managers' former assets, CIM hired Artisan Partners Asset Management ("Artisan") and T. Rowe Price.  (*Id.*, p. 2286 – Dep. Ex. 10; *see also id.*, p. 2338 –Slide, Q4 2012 Large Cap Fund.)  Artisan's mid-cap growth strategy had historically performed well, as had T. Rowe Price's mid-cap growth equity strategy (Movants' App'x, p. 2334 – Jan. 2012 T. Rowe Price Presentation), which made them

attractive prospective managers.

Over 2012 and 2013, CIM continued monitoring the Large Cap Fund's performance, which varied with respect to its benchmark, including with periods of strong performance during which active management provided value. (Movants' App'x, pp. 2160–61 – Dep. Ex. 48.) In mid-2014, as CIM continued to oversee the Fund and its managers, Cornerstone began to underperform expectations, which led to CIM conducting a deep dive into what caused the underperformance. In a March 2015 presentation containing working notes on active management in the Global Equity Program, CIM analyzed Cornerstone's challenging returns for 2014, observing that it "struggled to keep up in strong equity markets." (*Id.*, p. 1189 – March 2015 Presentation ("Dep. Ex. 12").) It also assessed Cornerstone's historical performance and concluded that, even with a difficult 2014, the strategy still had an attractive ability to generate excess returns over a ten-year period. (*Id.*, pp. 1189–90 – Dep. Ex. 12.)

CIM's review of Cornerstone included calls and in-person meetings with its portfolio manager, including in the second half of 2014. (Movants' App'x, p. 501 – Strong Decl. ¶ 30.) In 2015 and through the first quarter of 2016, CIM held four additional calls and a meeting with Cornerstone. (*Id.*) CIM's July 2016 presentation, which incorporates notes from those meetings (*id.*), reports on CIM's continued assessment of Cornerstone, as well as the market conditions at the time its strategy began to diverge. (*Id.*, pp. 1106–107 – July 2016 Presentation ("Dep. Ex. 17").) The Investment Committee determined that Cornerstone's underperformance had been driven by "global macro concerns like global growth and a strong US dollar." (*Id.*, p. 2344 – May 2016 CIM Board Meeting

Packet ("Dep. Ex. 16"); *see also id.*, p. 1106 – Dep. Ex. 17.)

In the second half of 2016, the CIM Investment Committee decided to reduce the asset allocation ranges for Cornerstone and Systematic (which had also experienced underperformance), due to the persistence of these extraordinary market conditions (*see* Movants' App'x, pp. 2229–31 – Matson Dep. Tr. 56:12–58:22).   The Investment Committee considered several options to effectuate that change (*id.*, p. 1104 – Dep. Ex. 17; *id.*, pp. 2219–23 – Strong Dep. Tr. 196:16–200:15) and determined it was appropriate to reduce the allocation to Cornerstone from 23.8% to 13.9% and to reduce the allocation to Systematic from 10.5% to 5.5%.  (*Id.*, p. 1269 – Sept. 2016 Presentation ("Dep. Ex. 18").)  At the end of 2016, CIM also terminated Artisan as a manager in connection with rebalancing the target date funds.  (*Id.*, pp. 2308–309 – Dec. 2016 Email ("Dep. Ex. 34"); *see also id.*, pp. 2224–25 – Strong Dep. Tr. 201:22–202:10.)

Between 2016 and 2017, CIM also made changes to the composition of the target date funds.   In particular, CIM reduced the allocations to the Large Cap Fund by approximately $100M in connection with the annual glide path rebalances in both years. (Movants' App'x, p. 8 – Gorrell Decl. ¶ 24.)  CIM implemented these adjustments to reduce the amount of active equity management in the target date funds, which would lower costs of the target date funds.  (*Id.*)

With the changes to the Large Cap Fund's composition, CIM continued to offer the Fund as an investment option with the reasoned objective of achieving outperformance over a market cycle.  (*See* Movants' App'x, pp. 2209–10, 2216 – Strong Dep. Tr. 79:20– 80:20, 111:3–13; *see also id.*, p. 2345 – Dep. Ex. 16.)  Indeed, the Fund's performance

began improving in the third quarter of 2016 and through September 2017.  (*See, e.g.*, *id.*, p. 2270 – Sept. 2016 Large Cap Fund Fact Sheet; *id.*, p. 2274 Dec. 2016 Large Cap Fund Fact Sheet; *id.*, p. 2278 June 2017 Large Cap Fund Fact Sheet.)  In September 2017, CIM merged the Large Cap Fund with the Small Cap Fund to create the Active U.S. Stock Fund.  CIM created the Active U.S. Stock Fund to simplify the participant experience, create broad market symmetry between the actively- and passively-managed U.S. equity offerings, and eliminate the highest fee core fund offering.  (*Id.*, p. 1311 – Sept. 2017 Email & Memorandum ("Dep. Ex. 67"); *see also id.*, p. 1325 – Lutito Decl., ¶ 40.)

As with their design allegations, plaintiffs' attack on CIM's process with respect to monitoring the Large Cap Fund is entirely undermined by the record evidence.  Discovery has shown that CIM utilized appropriate methods to investigate and assess the appropriate structural changes to the Large Cap Fund.  (*See id.*, p. 2409 – Porten Rep. ¶ 42 (concluding that CIM's processes and practices to monitor the Fund and target date funds were comprehensive and consistent with industry standards).)  Plaintiffs' emphasis on the Large Cap Fund's performance in their complaint is not sufficient to otherwise prove CIM had an imprudent process as to the design or management of the Fund. "[T]the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers."  *Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019).  As Dr. Montgomery explained in his report, any shortfalls in the Fund's returns relative to its benchmark can be attributed to market factors, rather than a flawed fund design or

management.  (*See id.*, pp. 2362–65 – Montgomery Rep. ¶¶ 38–43.)

Moreover, CIM's actions with respect to the Fund—including to maintain it as an investment option and as part of the target date funds from 2012 through 2017—cannot be measured "from the vantage point of hindsight."  *St. Vincent*, 712 F.3d at 716.  Even Mr. Levy, plaintiffs' process expert, conceded that the focus when viewing fiduciaries' conduct should not be judging the performance of investments with the benefit of hindsight.  (Movants' App'x, p. 2256 – Levy Dep. Tr. 205:17–20.)  Plaintiffs simply cannot support their claim that CIM breached its fiduciary duties.  *See Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 707 (W.D. Mo. 2019).

### 3.    All Evidence Shows CIM Acted Prudently With Respect To The Fund's Inclusion In The Target Date Funds.

Plaintiffs' contention that CIM should have replaced the Large Cap Fund as an underlying investment in the target date funds is unsupported.  This aspect of plaintiffs' claim focuses on their allegation that the target date funds "realized lower investment returns because of the Large Cap Fund's poor performance."  (Dkt. 94, ¶¶ 87–89.)  As discussed, CIM actively and consistently reviewed the Fund's managers and its performance, and it conducted the same extensive oversight of the target date funds.

For example, CIM's Asset Allocation and 401(k) Team reviewed the asset allocation in each target date fund on a monthly basis and implemented rebalancing as necessary.  (Movants' App'x, p. 6 – Gorrell Decl. ¶ 20.)  On an annual basis, CIM worked in conjunction with Morningstar to update the target asset allocations for the glide paths.  (*Id.*, p. 7 – Gorrell Decl. ¶ 23.)  These reviews of the target date funds included monitoring investments in the Plan's core funds, including the Large Cap Fund.  (*See, e.g.*, *id.*, pp.

2291–94 – Oct. 2015 Presentation; *id.*, pp. 121–24 – May 2016 Presentation.)

In the course of monitoring the target date funds, CIM reduced the funds' allocations to the Large Cap Fund.  (Movants' App'x, p. 8 – Gorrell Decl. ¶ 24; *id.*, pp. 2419–21 – Porten Rep. ¶ 64 & Table 1.)  As Mr. Porten observed, this modification is itself "further evidence of the comprehensive process used by CIM to monitor" the target date funds.  (*Id.*, pp. 2419–20 – Porten Rep. ¶ 64.)  Plaintiffs do not, and cannot, present sufficient evidence to demonstrate otherwise, including any evidence that the target date funds failed to meet their investment objectives.  (*Id.*, p. 516 – Dep. Ex. 3.)  Instead, CIM's process in managing and administering the target date funds is consistent with industry standards.  (*See Id.*, pp. 2416–20 – Porten Rep. ¶¶ 62–64.)  Without any evidentiary basis to support any purported breach as to the process CIM employed with respect to the target date funds, all that remains is plaintiffs' complaint about the performance of the target date funds, which is grounded in improper hindsight.  *St. Vincent*, 712 F.3d at 716.

**B.      Plaintiffs Cannot Prove That The CIM Decisions They Criticize Caused Any Loss To The Plan.**

Plaintiffs must also prove that the Plan's alleged loss resulted from CIM's purported breach.  *Pioneer II*, 858 F.3d at 1334.  Specifically, ERISA § 1109(a) requires plaintiffs to make "a showing of some causal link between the alleged breach and the loss plaintiff seeks to recover."  *Id.*; *see also Womack v. Orchids Paper Prods. Co. 401(k) Sav. Plan*, 769 F. Supp. 2d 1322, 1328 (N.D. Okla. 2011).  Plaintiffs have failed to present any evidence that the Plan suffered losses as a result of any alleged breach.

None of plaintiffs' expert witnesses could identify—or even attempted to identify—the necessary "causal link" between CIM's alleged breach and plaintiffs' purported

injuries.  Plaintiffs' damages expert, Mr. Nehls, testified that, in preparing his report, he did not review the reports of plaintiffs' other two experts—Mr. Duval and Mr. Levy, who opined on, respectively, whether CIM acted prudently with respect to the design and monitoring of the Fund and its processes.[10]  (Movants' App'x, pp. 2242–43 – Nehls Dep. Tr. 31:14–32:6.)  Similarly, Mr. Levy confirmed he was not offering an opinion on the performance of the Fund or whether participants suffered any injury as a result of CIM's purported breach.  (*Id.*, p. 2250 – Levy Dep. Tr. 98:3–23.)  Mr. Duval likewise indicated he did not have an understanding as to appropriate damages, or even know whether the Fund's performance would have been better or worse if CIM had followed the course he advocated. (*See id.*, pp. 2260–63 – Duval Dep. Tr. 206:23–209:13.)

Plaintiffs offer no other evidence demonstrating that, without the benefit of hindsight, a prudent fiduciary would have replaced the Large Cap Fund with something else that would have outperformed it.  *See Tatum*, 855 F.3d at 558.  Plaintiffs "must advance more than mere speculation" to show "that their loss was attributable to Defendants' alleged breaches of fiduciary duty."  *RSL Comm'cns PLC v. Bildirici*, 649 F. Supp. 2d 184, 220 (S.D.N.Y. 2009), *aff'd sub nom. RSL Commc'ns PLC, ex rel. Jervis v. Fisher*, 412 F. App'x 337 (2d Cir. 2011) (quotation marks omitted).  Because they are unable to do so, the Court should grant summary judgment for defendants as to plaintiffs' claim for breach of fiduciary duty against CIM.  *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2019 WL 4735876, at *6 (S.D.N.Y. Sept. 27, 2019).

---

[10] Nehl's damages calculations are based solely on the Fund's benchmark and investment goal, not on what would have happened had CIM made other decisions.

**II.      Plaintiffs Cannot Prove Their Claims Against CenturyLink.**

Plaintiffs' second and third claims for relief against CenturyLink are derivative of their first claim for breach of fiduciary duty against CIM.  As such, to the extent the Court grants summary judgment to defendants on the first claim, it should also do so for the second and third claims.  *Wildman*, 362 F. Supp. 3d at 711 (holding plaintiffs not liable for derivative failure to monitor claim because the court found no breach of fiduciary duty); *Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010) (same).  Moreover, even if plaintiffs' first claim survives, they cannot support their derivative claims.

**A.      CenturyLink Had No Duty to Monitor CIM.**

For their breach of the duty to monitor claim, plaintiffs must prove that CenturyLink is a fiduciary, had a duty to monitor CIM, and failed to fulfill that duty, resulting in injury. 29 U.S.C. § 1109; *White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2016 WL 4502808, at *18 (N.D. Cal. Aug. 29, 2016).  Plaintiffs cannot present sufficient evidence to prove these elements.  As to fiduciary status, sponsoring the Plan does not turn CenturyLink into a Plan fiduciary.  (Dkt. 78 at 24); *Beck v. PACE Int'l Union*, 551 U.S. 96, 101 (2007) (holding that actions taken as plan sponsor are not fiduciary in nature); *In re JPMorgan Chase & Co. ERISA Litig.*, No. 12 Civ. 04027 (GBD), 2016 WL 110521, at *2 (S.D.N.Y. Jan. 8, 2016), *aff'd sub nom. Loeza v. John Does 1–10*, 659 F. App'x 44 (2d Cir. 2016).  And discovery has shown that CenturyLink is neither a named nor a functional fiduciary, as recognized under ERISA.  *See Am. Benefit Plan*, 2006 WL 2632308, at *5–6.

First, the undisputed evidence demonstrates that CIM—not CenturyLink—is the named fiduciary for all purposes related to the management and investment of Plan

assets, which is the conduct plaintiffs challenge.  The Plan states that "CIM shall be the named fiduciary for all purposes of the management and investment of Plan assets," and CIM's powers include appointing and removing investment managers, monitoring the performance of service providers, and determining asset allocation ranges and investment strategies.  (Movants' App'x, p. 226–27 – Apr. 1, 2012 Plan; *see also* Dkt. 146 at 28.)  CIM's Governance and Investment Practices document likewise states that CIM is the investment fiduciary responsible for the investment of assets for the Plan.  (*See, e.g.*, *id.*, p. 1835 – 2012 Annual Report.)

Second, plaintiffs cannot present evidence establishing that CenturyLink became a functional fiduciary with respect to CIM.  CenturyLink did not direct or monitor CIM, which was overseen, from a corporate governance perspective, by the CIM Board of Directors.  (Movants' App'x, pp. 2237–38 – Lutito Dep. Tr. 40:24–41:6.)

Even if CenturyLink had a duty to monitor CIM, the undisputed facts show the CIM Board consists primarily of CenturyLink personnel, who were kept apprised of the Plan's performance, and CIM's management of its investments.  (Movant's App'x, pp. 1316–18 – Lutito Decl. ¶¶ 8, 11–13; *id.*, p. 2228 – Matson Dep. Tr. 21:8–25.)  They reviewed CIM's management and oversight of the Plan, including the Fund, during quarterly meetings and received detailed data relating to Plan investment management.[11]  (*See id.*, p. 1318 – Lutito Decl. ¶ 14.)  This level of oversight does not constitute a breach of the duty to monitor, which "does not carry with it the duty to review an investment fiduciary's every

---

[11] Ms. Lutito also made presentations to CenturyLink's Audit Committee annually. (Movants' App'x, p. 1317 – Lutito Decl. ¶ 10; *id.*, pp. 2238–39 – Lutito Dep. Tr. 41:7–42:9.)

decision." *Scalia v. WPN Corp.*, Civil Action No. 14-1494, 2019 WL 4748052, at *9 (W.D. Pa. Sept. 30, 2019); *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011).

Moreover, there was no reason for the CIM Board to believe CIM was breaching any fiduciary duty.  CIM's Investment Committee was made up of individuals who were highly qualified.  (*See* Movants' App'x, pp. 1318–19 – Lutito Decl. ¶¶ 15–16.)  Many individuals on the Investment Committee are CFA charterholders, "which is the gold standard of professionalism in the investment management industry."  (*Id.*, pp. 2385–86 – Porten Rep. ¶ 12; *see also id.*, p. 2394–96 – Porten Rep. ¶¶ 33–34; *id.*, p. 2348 – Levy Rep. ¶ 113 ("[T]he CIM organization included highly educated, credentialed, and experienced professionals.").)  CIM personnel also participated in annual training, conducted by in-house and outside counsel, related to their duties and responsibilities with respect to CIM's status as an investment fiduciary under ERISA.  (*Id.*, p. 2232–34 – Matson Dep. Tr. 216:22–218:2.)  Plaintiffs have failed to adduce evidence to satisfy the requirements of a duty to monitor claim, and there is no genuine issue of material fact requiring trial.  Summary judgment is appropriate as to the second claim.  *Celotex*, 477 U.S. at 323.

### B.    CenturyLink Is Not Liable As A Co-Fiduciary.

There is no evidence to support plaintiffs' claim that CenturyLink is liable as a co-fiduciary.  For a co-fiduciary liability claim, plaintiffs must establish that CenturyLink is a fiduciary, it had actual knowledge that a co-fiduciary was committing a breach, and it failed to stop the alleged breach.  *Gernandt v. SandRidge Energy Inc.*, Case No. CIV-15-1001-D, 2017 WL 3219490, at *11 (W.D. Okla. July 28, 2017).

As discussed, CenturyLink is not a fiduciary with respect to the management and investment of Plan assets.  Plaintiffs also cannot present evidence that CenturyLink had actual knowledge of any alleged fiduciary breach by CIM or that it failed to stop such a breach.  The evidence instead shows that CenturyLink would have been aware that CIM, as the designated investment fiduciary, had carefully designed the Large Cap Fund and extensively monitored its performance, as well as that of its managers.  (*See supra* § I.A.2.)  Accordingly, plaintiffs' third claim against CenturyLink also fails.

III.   **Plaintiffs' Claims Are Barred By The Safe Harbor Provision.**

Defendants are independently entitled to summary judgment under ERISA's safe harbor defense, which provides that "no person who is otherwise a fiduciary shall be liable under [ERISA] for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control."  29 U.S.C. § 1104(c).  A participant in a safe harbor plan may not hold plan fiduciaries liable for the results of her own investment choices.  *See Rogers*, 710 F. Supp. 2d at 736.   The safe harbor defense requires defendants to show the Plan: (1) provided for individual accounts; (2) allowed participants to exercise control over their accounts; (3) provided participants with the opportunity to choose from a broad range of investment options; (4) gave participants sufficient information to make informed decisions; and (5) if the plan offers qualifying employer securities, that it provided additional safeguards.   *Id.* at 729 (citing 29 C.F.R. § 2550.404c–1(b) & (d)(2)(ii)(E)(4); *Hecker v. Deere & Co.*, 556 F.3d 575, 587 (7th Cir. 2009)).  Here, because plaintiffs' purported injuries are attributable to their own decisions, the safe harbor defense bars their claims.

First, as required by § 404(c), Plan participants had the opportunity to exercise control over their individual investment accounts by giving investment instructions at any time. (*E.g.*, Movants' App'x, pp. 9, 13 – Gorrell Decl. ¶¶ 28, 42.) Defendants, who do not offer investment advice, do not exercise influence over participants' investment decisions. (*Id.*, p. 10 – Gorrell Decl. ¶ 31.) They also have made significant disclosures to participants. (*See infra*; *see also* Movants' App'x, pp. 12–13 – Gorrell Decl. ¶¶ 39–41.)

Second, the Plan participants could choose from a broad range of investment alternatives, including diversified funds with varying levels of risk and return potential. (*Id.*, pp. 10–12 – Gorrell Decl. ¶¶ 32, 33, 35–38.) These investment alternatives satisfy § 404(c)'s criteria. *See Hecker*, 556 F.3d at 589–90; *see also Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 878 (N.D. Ill. 2009) (finding nine investment alternatives to be "sufficiently broad to enable the participants to make meaningful decisions").

Third, detailed information about the Plan, including information about each investment option, its managers and allocations, fees, performance, and risk, was regularly provided or made available to participants. (*See, e.g.*, Movants' App'x, pp. 416–72 – Mar. 2013 Fund Fact Sheets; *id.*, pp. 12–13 – Gorrell Decl. ¶¶ 39–41; *id.*, pp. 2430–51 – Jan.-Mar. 2016 Detwiler Account Statement; *see also id.*, pp. 325–33, 341–44 – 2013 SPD.) Finally, the Plan meets additional criteria for plans offering employer securities. (*Id.*, pp. 13–14 – Gorrell Decl. ¶¶ 43–47; *id.*, pp. 361–62 – 2015 SPD.)

There is no dispute that participants directed the investments of their Plan assets, or that they were kept apprised of the Fund's objectives, structure, and performance over time. The injury plaintiffs purport to have suffered by virtue of the Fund's failure to match

or exceed the returns of the Russell 1000 resulted directly from their informed choices to invest the assets of their accounts in the Large Cap Fund or target date funds.  *See Rogers*, 710 F. Supp. 2d at 736 (finding that any injury resulted from participants' acquisitions of the stock at issue).  Thus, the safe harbor defense bars plaintiffs' claims.

## IV.   Defendants Are Entitled To Summary Judgment On Their Standing And Statute Of Limitations Defenses Against Birse.

Defendants are entitled to summary judgment as to Birse's standing to bring claims based on direct allocation to the Large Cap Fund.  An ERISA plaintiff cannot establish constitutional standing for claims that are premised on investments in which she did not participate because she cannot show an injury.[12]  *See Caltagirone v. N.Y. Cmty. Bancorp, Inc.*, 257 F. App'x 470, 473 (2d Cir. 2007); *Barrett v. Pioneer Nat. Res. USA, Inc.*, No. 17-cv-1579-WJM-NYW, 2018 WL 3209108, at *3–4 (D. Colo. June 29, 2018).  Birse did not directly invest in the Fund (Dkt. 94, ¶¶ 22, 101(e)), and she did not suffer any loss as a result of a direct investment in the Fund (Movants' App'x, p. 2426 – Birse Dep. Tr. 31:19–23).  She thus lacks standing to assert claims premised on harm caused by direct investment in the Fund.  *David v. Alphin*, 817 F. Supp. 2d 764, 781 (W.D.N.C. 2011).

Birse's claims also are untimely.  Under ERISA, an action is barred by the statute of limitations if brought more than "three years after the earliest date on which the plaintiff had actual knowledge of the breach."  29 U.S.C. § 1113(2); *Mid-S. Iron Workers Welfare*

---

[12] Birse must demonstrate constitutional and statutory standing.  *See Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1224–26 (10th Cir. 2011).  Constitutional standing requires a plaintiff to demonstrate an injury in fact, a causal connection between the injury and the conduct complained of, and a likelihood that the injury will be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

*Plan v. Harmon*, 645 F. App'x 661, 665 (10th Cir. 2016).  Actual knowledge exists if the plaintiff knows "all material facts necessary to understand that some claim exists." *Mid-S. Iron Workers Welfare Plan v. Harmon*, No. CIV-15-138-C, 2015 WL 1137403, at *2 (W.D. Okla. Mar. 12, 2015).  Defendants' disclosure of information triggers the statute of limitations. *Bernaola v. Checksmart Fin. LLC*, 322 F. Supp. 3d 830, 837 (S.D. Ohio 2018).

Birse received, or had access to, communications describing the multi-manager design and objective of the Large Cap Fund and naming its managers as early as 2012.[13] (*See* Movants' App'x, pp. 12–13 – Gorrell Decl. ¶¶ 39–40; *id.*, p. 413 – 2012 Summary of Material Modifications; *id.*, pp. 2265–67 – June 2012 Large Cap Fund Fact Sheet.)  Birse also received quarterly account statements detailing the performance of the Fund and directing her to fund fact sheets for additional information more than three years before filing suit, including during periods in which she alleges the Fund underperformed.[14]  (*See id.*, p. 2427 – Birse Dep. Tr. 58:2–8; Dkt. 94, ¶¶ 5, 60–62, 89.)  Because Birse had actual knowledge of the essential allegations underlying her claim—*i.e.*, that the Fund was an actively managed, multi-manager fund, was included in the target date fund, and underperformed against its benchmark fund—more than three years before filing suit, her claims are barred under ERISA's statute of limitations.

## CONCLUSION

The Court should grant summary judgment in favor of defendants.

---

[13] Birse received quarterly account statements in the mail (Movants' App'x, pp. 2425, 2427 – Birse Dep. Tr. 22:10–23, 58:2–8) and also would have received Plan communications (*id.*, p. 12 – Gorrell Decl. ¶ 39; *id.*, p. 2428 – Birse Dep. Tr. 59:12–21).
[14] Much of the information underlying Birse's complaint must be disclosed to plan participants pursuant to Department of Labor regulations. *See* 29 C.F.R. § 2550.404a-5.

Dated:  November 19, 2019              Respectfully submitted,

                                       By:      /s/ *Craig C. Martin*

HOLLAND & HART LLP                     JENNER & BLOCK LLP
Michael S. Beaver                      Craig C. Martin
Matthew J. Smith                       Amanda S. Amert
Melissa Y. Lou                         Matt D. Basil
Kimberly J. Willis                     Michele L. Slachetka
6380 South Fiddlers Green Circle       Cristina Covarrubias
Suite 500                              Laura L. Norris
Greenwood Village, Colorado 80111      353 North Clark Street
Tel: (303) 290-1600 CL 00006603        Chicago, Illinois 60654
                                       Tel: (312) 923-2776
                                       Fax: (312) 840-7776

                                       *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 19, 2019, I have caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Paul R. Wood
Devyn R. Glass
Donald S. Nation
FRANKLIN D. AZAR & ASSOCIATES, P.C.
14426 East Evans Avenue
Aurora, Colorado 80014
Telephone: (303) 757-3300
Facsimile: (303) 757-3206
woodp@fdazar.com
glassd@fdazar.com
nations@fdazar.com

***Attorneys for Plaintiffs***

/s/ *Craig C. Martin*
Craig C. Martin