IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 17-cv-02872-CMA-NYW

BONNIE BIRSE & GERAD DETWILER, individually and on behalf of all similarly situated participants and beneficiaries of the CenturyLink Dollars & Sense 401(k) Plan,

    Plaintiffs,

v.

CENTURYLINK, INC., and
CENTURYLINK INVESTMENT MANAGEMENT COMPANY,

    Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Plaintiffs Bonnie Birse and Gerad Detwiler's Motion for Summary Judgment as to Defendants' Breach of Fiduciary Duty for Failure to Monitor (Doc. # 157) and Defendants CenturyLink Investment Management Company ("CIM") and CenturyLink, Inc.'s ("CenturyLink") Motion for Summary Judgment (Doc. # 158). Both Motions have been fully briefed. (Doc. ## 164, 166, 171, 173.) For the following reasons, the Court grants Defendants' Motion and denies Plaintiffs' Motion.

### I.    BACKGROUND

CenturyLink is a publicly traded telecommunications company, and it offers the CenturyLink Dollars & Sense 401(k) Plan ("the Plan") to its employees as a retirement planning option. (Doc. # 158 at 1.) CenturyLink is the Plan sponsor and CIM is the Plan

Investment Fiduciary. CIM makes all investment decisions, "including determining general investment strategies for Plan assets, selecting outside investment managers and monitoring the performance of the Plan." (*Id*.)

The Plan offered participants numerous investment options, including the Active Large Cap U.S. Stock Fund ("the Fund"). The Plan's target date funds—all-in-one funds that invest increasingly conservatively as participants near their target date of retirement—also included the Fund as a component. The goal of the Fund at its inception was to "obtain excess returns over the Russell 1000 Stock Index ('Russell 1000'), with increased downside and wealth protection, at a reasonable price over the long term." (*Id*. at 3.) Although the Fund trailed its benchmark for the majority of its five-year existence, nevertheless, the Fund provided substantial gains for Plan participants. In fact, "[p]articipants who invested in the Fund throughout its . . . life received an 83% cumulative return" on their initial investment. (*Id*. at 7.)

Plaintiffs allege that Defendants breached their fiduciary duties by creating the Fund and maintaining it as an investment option for Plan participants. More specifically, Plaintiffs argue that the Fund "underperformed immediately and consistently due to its flawed and imprudent design, and CIM failed to appropriately monitor and adjust the Fund because it lacked any formal process or guidelines for doing so." (Doc. # 157 at 1.) Additionally, Plaintiffs assert that "CenturyLink, as the plan sponsor and a co-fiduciary, in turn failed in its duty to monitor CIM." (*Id*.) In support of their position, Plaintiffs rely heavily on the expert opinions of Roger Levy and John Duval. After reviewing information related to Defendants' design and monitoring procedures with

respect to the Fund, both experts concluded that Defendants failed to fulfil their responsibilities as fiduciaries.

Defendants, by contrast, argue that "[a]ll of the evidence demonstrates that CIM employed a prudent process in designing and monitoring the [Fund] . . . ." (Doc. # 171 at 2.) Further, Defendants assert that CIM "engaged in a robust monitoring process and implemented appropriate structural changes to the Fund over the course of its life." (*Id*.)

## II. LEGAL STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbot Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 118 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for summary judgment, a court may not resolve issues of credibility, and must view the evidence in the light most favorable to the nonmoving party—including all reasonable inferences from that evidence. *Id*. However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id*. In

attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claims; rather, the movant need simply point the court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant meets its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy this burden. *Id*. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence from which a rational trier of fact could find for the nonmoving party." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id*. Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

**B.    ERISA DUTY OF PRUDENCE**

The "central purpose of ERISA is 'to protect beneficiaries of employee benefit plans.'" *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 63 (2d Cir. 2016) (quoting *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009)). As a result, ERISA imposes a duty on fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and

4

familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ." 29 U.S.C. § 1104(a)(1)(B). Courts analyze the duty of prudence "according to the objective prudent person standard developed in the common law of trusts," and courts emphasize that ERISA's "fiduciary duty of care . . . requires prudence, not prescience." *Rinehart*, 817 F.3d at 63 (citations omitted).

### III. DISCUSSION

Plaintiffs allege that CIM breached its fiduciary duties by imprudently designing the Fund and subsequently failing to monitor the Fund's performance. However, the evidence in the record shows that CIM's design of the Fund was prudent and that CIM diligently monitored the Fund. The evidence Plaintiff has submitted does not create a genuine dispute of material fact and, therefore, Defendant CIM is entitled to summary judgment on Plaintiffs' breach of fiduciary duty claims. As such, Plaintiffs' derivative claims against CenturyLink fail as a matter of law.

### A. CIM PRUDENTLY DESIGNED THE FUND

Fiduciaries such as CIM have "a duty to exercise prudence in selecting investments . . . ." *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828 (2015). To determine whether a fiduciary has breached its duty of prudence in this context, courts apply an objective standard which focuses "on a fiduciary's conduct in arriving at an investment decision, not on its results . . . ." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996); *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) ("We cannot rely, after the fact, on the magnitude of the decrease in the [relevant investment's] price;

5

rather, we must consider the extent to which plan fiduciaries at a given point in time reasonably could have predicted the outcome that followed." (citation omitted)). Thus, a fiduciary must "employ[ ] the appropriate methods to investigate and determine the merits of a particular investment." *In re Unisys*, 74 F.3d at 434. Accordingly,

> [C]ompliance with the prudent-[person] standard requires that the fiduciary give 'appropriate consideration' to whether an investment 'is reasonably designed, as part of the portfolio . . . to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment."

*St. Vincent*, 712 F.3d at 716 (quoting 29 C.F.R. § 2550.404a–1(b)(2)(i)).

The evidence indicates that CIM's evaluation of the merits of the Fund's design satisfies the prudent person standard. The investment objective of the Fund was to "[e]xceed the return of a broad market index of the largest 1,000 companies in the U.S. using an actively managed multi-manager approach." (Doc. # 158-5 at 1.) In developing that objective, "CIM undertook extensive, appropriate research into how to structure the Fund, including with respect to an appropriate strategy and the selection of managers." (Doc. # 158 at 12.)

Paul Strong, the Director of CIM's Investment Strategy and Co-director of the Investment Strategy & Implementation Team, was heavily involved in the design of the Fund before it was offered to Plan participants in 2012. (Doc. # 158-6 at 42–43.) Mr. Strong has a bachelor's degree in Business and as well as a Master of Business Administration. (*Id*. at 43.) Additionally, Mr. Strong is a Chartered Financial Analyst ("CFA"), "which is the highest distinction in the investment management profession."

(*Id.*) As Mr. Strong's declaration regarding the process involved in designing the fund illustrates, CIM engaged in a robust decision-making process:

> I led the CIM team designing the Fund, which included Aaron Houlihan, Brian Luedtke . . . . Both Mr. Houlihan and Mr. Luedtke . . . had approximately ten years of investment experience at the time we designed the Fund; they also both held the CFA designation. . . .
>
> With the [Fund], CIM sought to achieve excess returns over a benchmark [the Russell 1000], at a reasonable price over a full market cycle. The [Fund] was also designed to be in line with CIM investment philosophies, including that active management can add value over time. . . . To achieve these objectives, CIM structured the Large Cap Fund as an active, multi-manager fund, with a mid-cap bias and a slight value bias. . . . CIM structured the [Fund] with multiple managers and allocated a portion of the [Fund's] assets to each manager. This multi-manager strategy was designed to provide participants with full beta exposure to asset classes, maintain sufficient liquidity to allow for efficient rebalancing, and provide excess returns above the passive benchmark while minimizing downside risk.
>
> \* \* \*
>
> CIM undertook **extensive quantitative and qualitative research regarding how to structure the [Fund]**, including as to the appropriate strategy and the composition and number of managers, both before and after the Fund was offered to Plan participants. CIM consulted and relied upon industry literature and data and communications with industry experts, peers, and current managers.
>
> For example, research into historical trends helped inform the biases that were selected for the [Fund]. Prior to the inception of the [Fund] value stocks had outperformed growth stocks and mid-cap stocks had outperformed large cap stocks, and value stocks tended to perform better than growth stocks during overall market declines. Moreover, mid-cap and value exposures were historically uncorrelated, increasing the probability that at least one of these strategies would provide excess returns at a given time. . . . **I also spoke with multi-asset portfolio managers at other firms, including JP Morgan, Northern Trust, and others, about their approach to building a multi-manager fund**. During these discussions, I gathered information about how other portfolio managers thought about a multi-manager program and how many different managers should be in a program.

> We also **evaluated the [Fund] in hypothetical past markets and conducted numerous back-tests**. . . . These pro forma analyses provided information on how the [Fund] would have performed with certain managers under consideration, and we implemented updates to the design of the Fund based on those analyses.
>
> Retirement investment funds like those in the Plan are intended to be long-term investments. Thus, although performance was measured and evaluated over shorter periods, **the [Fund] was intended to generate excess returns and protect against downside risk over a full market cycle. CIM's Investment Committee understood that could mean it would lag in up markets. In our view, the downside risk protection was worth this trade-off**.

(*Id*. at 43–47) (emphasis added). Thus, CIM's highly qualified team of professionals rigorously analyzed the purpose the Fund would serve, how it would accomplish that purpose, and the Fund's strategic place within the overall portfolio of the Plan.

Defendants' expert, Charles Porten, reviewed the above-referenced procedures that CIM employed in designing the Fund. (Doc. # 158-31.) Mr. Porten has "over three decades of experience in the investment management industry as an investor, equity analyst, research director, portfolio manager, chief investment officer, and business manager . . . ." (*Id*. at 10.) Additionally, Mr. Porten has been employed at institutions similar to CIM, and he has experience managing portfolios similar to the ones at issue. (*Id*.) Mr. Porten concluded that "CIM's investment processes and practices were thorough and consistent with industry standards," and that the process CIM employed in designing the Fund was similarly "very thorough and analytical." (*Id*. at 37.)

Based on the robust procedures involved in designing the Fund and Mr. Porten's assessment that those procedures were comprehensive and consistent with industry standards, the Court finds that CIM gave "'appropriate consideration' to whether [the

8

Fund] '[was] reasonably designed, as part of the portfolio . . . to further the purposes of the [P]lan, taking into consideration the risk of loss and the opportunity for gain . . . associated with the investment.'" *St. Vincent*, 712 F.3d at 716 (quoting 29 C.F.R. § 2550.404a–1(b)(2)(i)). Therefore, CIM has shown that it satisfied its duty of prudence with respect to the Fund's design.

**B.    CIM PRUDENTLY MONITORED THE FUND**

Under the duty of prudence, a fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828. Thus, a fiduciary "cannot assume that if investments are legal and proper for retention at the beginning of the trust, or when purchased, they will remain so indefinitely." *Id*. (quoting G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 145–146 (3d ed. 2009)) ("In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts."). "Rather, the [fiduciary] must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate." *Id*.

In fulfilling these duties, a fiduciary is held to "the prudent investor rule," which requires that the fiduciary "invest and manage trust assets as a prudent investor would," i.e., by "exercis[ing] reasonable care, skill, and caution," and by "reevaluat[ing] the . . . investments periodically as conditions change." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (on remand from the Supreme Court). Notably, "the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers," because "[i]f that were the case, Plan sponsors would be duty-bound to merely follow the industry rankings for the past year's results,

9

even though past performance is no guarantee of future success." *Patterson v. Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019).

The evidence indicates that CIM's oversight of the suitability of the Fund satisfies the prudent person standard. John Litchfield is CIM's Director of Investments and co-directs the Investment Strategy & Implementation Team. (Doc. # 158-6 at 38.) Mr. Litchfield has a master's degree in finance and over thirty years of investment experience. (*Id.*) In conjunction with Mr. Strong, Mr. Litchfield oversees "the team responsible for designing, constructing, and managing the investment portfolios within [CenturyLink's] benefit trusts and plans." (*Id.*) Accordingly, Mr. Litchfield is familiar with CIM's process for monitoring its investments, including the Fund. In describing that process, Mr. Litchfield indicated that:

- CIM's Investment Committee ("the Committee") received monthly performance reports created by CIM personnel based, in part, on data provided by Northern Trust, and quarterly performance reports prepared by the Asset Allocation & 401(k) Team.
- The Committee met at least bi-monthly, and held quarterly performance review and quarterly risk meetings, during which the Committee reviewed performance and managers at a program level. When necessary, the Committee could also discuss a particular fund, including the Fund, and/or its managers and performance.
- Performance reviews of each strategy, including the Fund, were typically presented to the Committee on an annual basis. During these reviews, the Committee also evaluated fund and manager performance, among other considerations and metrics.

- When a fund or manager underperforms on a sustained basis, the Committee takes it extremely seriously. Such underperformance is noted and discussed as appropriate during quarterly performance meetings, and additional research, analysis, and diligence may be presented to help the Investment Committee understand the situation and consider what, if any, actions are appropriate. The underperformance of the Fund was analyzed as part of this process, and changes to the Fund over time resulted.
- In addition to regularly scheduled meetings, appropriate CIM employees interacted with the individual investment managers of its funds, including the investment managers in the Fund, on a less formal basis. CIM employees had periodic contact with each of the investment managers retained to manage CIM's assets through calls, emails, and/or in-person meetings.

(*Id*. at 40–41.)

In Addition, Mr. Strong explained that "CIM used long-term outperformance of the passive benchmark on a rolling three-year basis as one quantitative measure in determining the success of the [Fund's] strategy." (*Id*. at 51.) Moreover, CIM "considered other quantitative information, including absolute fund and manager performance, manager performance against the manager level benchmark determined as part of the design process, fund and manager performance relative to eVestment manager universe data and CIM's expectations, fund and manager risk statistics and historical performance." (*Id*. at 51–52.) Despite ongoing analysis and discussions that took the Fund's underperformance into account, "[p]rior to 2016, [CIM] concluded that

11

the underperformance was driven by market conditions," and that the Fund should continue to be offered to Plan participants. (*Id*. at 53.)

However, as a result of CIM's monitoring procedures, CIM made adjustments to the Fund throughout its existence. For instance, CIM replaced various investment managers and it changed the asset allocation ranges for other managers. Additionally, Mr. Strong indicated that:

> CIM also changed asset allocations for Fund managers at several different points in time. In the second half of 2016, in light of the historically unprecedented persistence of extraordinary market conditions, the Committee determined that an adjustment in the Fund's approach was appropriate and reduced asset allocations to [two investment managers]. **This decision flowed from a series of ongoing discussions in 2014 and 2015 and was the product of extensive research, analysis, and discussion**.

(*Id*.) (emphasis added). Finally, in September 2017, "CIM merged the [Fund] with the Small Cap Fund," seeking to "simplify the participant experience and create broad market symmetry between the actively and passively managed U.S. equity offerings and to eliminate the highest fee core fund offering . . . ." (Doc. # 158-7 at 1.)

After reviewing CIM's above-referenced monitoring procedures, Mr. Porten—Defendants' expert—concluded that "the process used by CIM to monitor the [Fund] . . . was very comprehensive, analytical and reflects thorough due diligence, consistent with industry standards." (Doc. # 158-31 at 37.) Mr. Porten also observed that "the comprehensive process used by CIM to monitor the [Fund] is reflected in the changes CIM made to the [Fund] over time . . . ." (*Id*. at 41); *see also Patterson*, 2019 WL 4934834, at *11 (concluding fiduciary acted prudently in maintaining underperforming investment because fiduciary "clearly adjusted to changing information . . . .").

In summary, the evidence in the record shows that CIM systematically analyzed the Fund at regular intervals to ensure that it was an appropriate long-term investment for Plan participants, and CIM made reasoned decisions based on appropriate sources of data. In doing so, CIM exercised reasonable care, skill, and caution, and it reevaluated the Fund periodically as conditions changed. Therefore, CIM has shown that it satisfied its duty of prudence with respect to its monitoring procedures. *See, e.g.*, *Jenkins v. Yager*, 444 F.3d 916, 925–26 (7th Cir. 2006) (finding defendant did not breach fiduciary duties by retaining funds that underperformed for three years because "investment strategy . . . to find long-term, conservative, reliable investments that would do well during market fluctuations" for long-term investment was not unreasonable or imprudent); *Dorman v. Charles Schwab Corp.*, No. 17-CV-00285-CW, 2019 WL 580785, at *6 (N.D. Cal. Feb. 8, 2019) (finding three to five year periods of underperformance to be "relatively short periods of underperformance."); *White v. Chevron Corp.*, No. 16-cv-0793 (PJH), 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("Indeed, a fiduciary may – and often does – retain investments through a period of underperformance as part of a long-range investment strategy.").

## C.     PLAINTIFFS HAVE NOT SHOWN A DISPUTE OF MATERIAL FACT

Plaintiffs argue that "Defendants lacked functional processes for nearly every aspect of designing, implementing, monitoring and adjusting the [Fund]." (Doc. # 157 at 3.) As demonstrated by the detailed procedures set forth in Sections A and B, *supra*, Plaintiffs' argument is factually unsupported. However, Plaintiffs attempt to manufacture a dispute of fact through their experts' interpretation of the procedures Defendants

maintained. Plaintiffs cannot succeed in that attempt because their experts' critique of Defendants' procedures does not suggest that Defendants breached their duty of prudence.

In their Motion, Plaintiffs argue that Defendants breached their duty of prudence in three ways. Specifically, Plaintiffs argue that Defendants breached their fiduciary duties because they: (1) did not have "any formal, written process in place governing the administration and management of the Fund," (2) failed to "create any process or guidelines to address the Fund's underperformance," and (3) gave Mr. Strong "excessive discretion in management of the Funds, and CenturyLink and CIM failed to oversee his management." (Doc. # 157 at 25–29.) The common theme of Plaintiffs' arguments is that Defendants did not sufficiently document their procedures. Notably, however, Plaintiffs do not cite a single case in their Motion that indicates Defendants' alleged conduct would constitute a breach of the duty of prudence. *See* (*id*.); *cf. O'Connor v. Certainteed Corp.*, No. CIV. A. 87-3866, 1990 WL 14457, at *8 (E.D. Pa. Feb. 16, 1990) (ERISA does not require written procedures "if the unwritten practices are adequate.").

Rather, Plaintiffs rely—almost exclusively—on Roger Levy's opinion that the alleged conduct constitutes a breach of Defendants' fiduciary duties. *See, e.g.*, (*id*. at 28) (citing Levy's opinion that "the lack of a documented process cast[s] doubt upon the prudence of how the [Fund] was constructed," in support of the proposition that the lack of documentation "undermines the prudence" of the Fund's construction). Plaintiffs'

strategy is flawed because Mr. Levy's opinion of what constitutes a breach of the duty of prudence is distinct from what ERISA requires.

In fact, a court recently gave Mr. Levy's opinions about an ERISA fiduciary's obligations "no weight" because at trial, Mr. Levy:

> acknowledged that his approach has not won wide acceptance in the retirement plan industry, with only fourteen to sixteen retirement plans out of approximately 500,000 conforming to these standards. While the Court agrees with Mr. Levy that fiduciaries should strive to attain the standards he champions, **they are not the standards ERISA requires**.

*Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 696 (W.D. Mo. 2019) (emphasis added). Importantly, Mr. Levy's opinions in this case are based on the same "prudent practices" that the court rejected in *Wildman*. (Doc. # 155-2 at 10.) Therefore, this Court finds that Mr. Levy's opinions cannot form the basis of a genuine dispute of material fact regarding whether Defendants breached their duties under ERISA because Mr. Levy's opinions are based on an unrelated standard.

Moreover, even if Mr. Levy's opinions were consistent with ERISA standards, they would still fail to create a dispute of material fact.[1] Courts have held that even if an expert proposes a better alternative to a fiduciary's conduct, the fiduciary will not be in breach of its duties if its course of conduct was prudent. *See Taylor v. United Techs.*

---

[1] "Expert testimony is useful as a guide to interpreting . . . facts, but it is not a substitute for them." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). Therefore, "summary judgment must be granted if the opposition thereto 'rest[s] solely on an expert's 'bottom line' conclusion, without some underlying facts and reasons, or a logical inference process to support the expert's opinion.'" *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 248 (D. Mass. 2014) (quoting *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1105 (1st Cir. 1994)), *aff'd*, 842 F.3d 34 (1st Cir. 2016). Plaintiffs' arguments present a paradigmatic example of attempting to impermissibly use an expert's bottom line conclusion as a substitute for facts.

*Corp.*, No. 3:06cv1494 (WWE), 2009 WL 535779, at *9 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x 525 (2d Cir. 2009). "[S]o long as the 'prudent person' standard is met, ERISA does not impose a duty to take any particular course of action if another approach seems preferable." *Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2019 WL 4735876, at *5 (S.D.N.Y. Sept. 27, 2019) (quoting *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006)).

The evidence indicates that CIM's evaluation of the merits of the Fund's design, and its analysis of the Fund's subsequent performance, satisfies the prudent person standard. *See supra* Section A, B. Therefore, the alternative courses of conduct that Plaintiffs' experts propose do not cast doubt on, or negate, the prudence of the substantive measures that Defendants employed.

In summary, there is no genuine dispute of material fact with regard to whether CIM breached its duty of prudence. As a consequence, Plaintiffs' derivative claims against CenturyLink fail as a matter of law because they are premised upon CIM's purported breach. *Wildman*, 362 F. Supp. 3d at 711 (a "derivative claim, such as a claim alleging a breach of the duty to monitor [fiduciaries], cannot survive without . . . an underlying breach." (citations omitted)).

### IV. <u>CONCLUSION</u>

Based on the foregoing, the Court ORDERS as follows:

- Defendants' Motion for Summary Judgment (Doc. # 158) is GRANTED;
- Plaintiffs' Motion for Summary Judgement (Doc. # 157) is DENIED;
- All other outstanding motions in this case are DENIED AS MOOT; and

- The Clerk of the Court respectfully is directed to enter judgment in favor of Defendants and against Plaintiffs.

DATED: March 5, 2020

BY THE COURT:

*Christine M Arguello*
CHRISTINE M. ARGUELLO
United States District Judge